United States Court of Appeals,

Fifth Circuit.

No. 95-50160.

WASHINGTON LEGAL FOUNDATION;  William R. Summers;  Michael J. Mazzone, Plaintiffs-Appellants,

v.

TEXAS EQUAL ACCESS TO JUSTICE FOUNDATION;  W. Frank Newton, Chairman, Texas Equal Access to Justice Foundation;  Thomas R. Phillips, Chief Justice;  Raul Gonzalez, Justice;  Jack Hightower, Justice;  Nathan L. Hecht, Justice;  Lloyd A. Doggett, Justice;  Bob Gammage, Justice;  Craig T. Enoch, Justice;  John Cornyn, Justice;  Rose Spector, Justice;  Supreme Court Dfts, Defendants-Appellees.

Sept. 12, 1996.

Appeal from the United States District Court for the Western District of Texas.

Before WISDOM, GARWOOD and JONES, Circuit Judges.

WISDOM, Circuit Judge:

The plaintiffs-appellants appeal the district court's denial of their motion for summary judgment and the court's award of summary judgment to the defendants-appellees, in which the district court upheld the constitutionality of the Texas statute, Interest on Lawyers Trust Accounts Program (IOLTA), and found that the defendants are entitled to limited immunity under the Eleventh Amendment.  For the reasons that follow, we REVERSE the judgment of the district court in part, VACATE and remand in part, and AFFIRM in part.

I.

*Statement of Facts*

Clients often give their attorneys money to be held in escrow, such as retainer fees or closing costs for a transaction.  In Texas, traditional ethical rules require attorneys to place this money in a trust account that permits withdrawal on demand.  The ethical rules also allow attorneys to aggregate all client funds into a single trust account and prohibit attorneys from commingling their own money

1

with the trust fund. Because federal law prohibited banks from paying interest on demand accounts,[1] these accounts formerly amounted to interest-free loans to the banks.

In 1980, new banking regulations allowed negotiable order of withdrawal (NOW) accounts,[2] which operate as interest-bearing checking accounts. NOW accounts created a vehicle for attorneys to pool client funds into an interest-bearing trust account, provided that none of the funds belong to a for-profit corporation.[3] Attorneys, however, may not deduct the costs of maintaining the trust account from the interest earned, because such a practice would constitute an impermissible benefit from the management of the trust account in violation of the ethical rules.

The creation of NOW accounts led to the development of IOLTA programs. The IOLTA concept arises from the premise that there are still situations in which, because of the nominal amount of a client's funds to be held or the brief period for which a client's funds will be held, NOW accounts are not feasible; because the costs of maintaining such accounts outweigh the interest that each client would have earned. In these situations, the trust accounts still operated as interest-free loans to the banks. IOLTA is an attempt to switch this benefit from the banks to legal providers for the indigent.

Under its statutory power to regul ate the state bar, the Texas Supreme Court created its IOLTA program in 1984, which is modeled after IOLTA programs used in other states and which seeks to capitalize on this banking anomaly. The IOLTA program originally permitted attorneys to place client funds that were "nominal in amount" or were "reasonably anticipated to be held for a short period of time" into an unsegregated interest-bearing bank account (IOLTA account), the interest of which is paid to the Texas Equal Access to Justice Foundation (TEAJF), a non-profit

---

[1]S.REP. NO. 96-368, 9th Cong., 2d Sess. 5, *reprinted in* 1980 U.S.C.C.A.N. 240, 240.

[2]Depository Institutions Deregulation and Monetary Control Act of 1980, 94 Stat. 132, 146 (codified as amended at 12 U.S.C.A. § 1832 (West 1989)); *see also* S.REP. NO. 96-368, *reprinted in* 1980 U.S.C.C.A.N. at 242-43.

[3]*See* 12 U.S.C.A. § 1832(a)(2) (permitting NOW accounts to consist of commingled funds belonging to numerous individuals or non-profit organizations or both).

corporation created by the Texas Supreme Court.[4] At that time, Texas's IOLTA program was voluntary, meaning that an attorney could choose whether to participate but clients had no choice, other than to select an attorney who did not maintain an IOLTA account.

The TEAJF's purpose is to manage and distribute the interest earned from the IOLTA accounts to non-profit organizations that "have as a primary purpose the delivery of legal services to low income persons",[5] with the exception that no funds may be used to financing class action lawsuits or to lobby on behalf of a political candidate or issue.[6] Nearly all states have similar systems, which were designed to provide much-needed finances to legal providers for the impoverished. States have drastically slashed the budgets for such programs over the years; in 1993, the Texas legislature even refused to enact a modest increase in court filing fees to compensate for temporary IOLTA shortfalls.

Initially, the Texas IOLTA program did not meet expectations. Attorneys were reluctant to deposit their client funds into IOLTA accounts and impoverished Texas citizens still were unable to obtain legal assistance because of a lack of resources. Texas's voluntary IOLTA program yielded only $1 million per year. Following the lead of several other states and the recommendation of the American Bar Association, in 1988, the Texas Supreme Court made attorney participation in the IOLTA program mandatory, requiring that attorneys deposit client funds in IOLTA accounts under certain circumstances.[7] The revised rules, which became effective in 1989, state that

> [a]n attorney ... receiving in the course of the practice of law ... client funds that are nominal

---

[4]*See* TEX.GOV'T CODE ANN. tit. 2, subtit. G, app. A, art. 11 §§ 6-7 (1987). Attorneys must make a reasonable determination as to whether a client's funds are nominal in amount or only to be held for a short period of time. When this determination is made in good faith, then an attorney cannot be liable for this decision. *Id.* § 7.

[5]TEXAS RULES OF COURT—STATE, Rules Governing the Operation of the Texas Equal Access to Justice Program [TEAJF rule] rule 10 (West 1996).

[6]*Id.* rule 15. The TEAJF, however, may provide funds "to finance suits against governmental entities on behalf of individuals in order to secure entitlement to benefits", such as Social Security, Medicaid, and public housing. *Id.*

[7]Attorneys and law firms must open their own IOLTA accounts at a financial institution and direct the depository institution "to remit, at least quarterly, interest earned on the average daily balance in the account, less reasonable service charges" to the TEAJF. TEAJF rules 7, 9.

in amount or are reasonably anticipated to be held for a short period of time, *shall* establish and maintain a separate interest-bearing demand account at a financial institution and *shall* deposit in the account all those client funds.[8]

The rules further guide an attorney's decision as to whether funds are suitable for deposit in an IOLTA account, stating that a client's funds may be deposited in an IOLTA account only if

> such funds, considered without regard to funds of other clients which may be held by the attorney ..., could not reasonably be expected to earn interest for the client or if the interest which might be earned on such funds is not likely to be sufficient to offset the cost of establishing and maintaining the account, service charges, accounting costs and tax reporting costs which would be incurred in attempting to obtain interest on such funds for the client.[9]

> Under the mandatory IOLTA program, Texas realized a dramatic increase in IOLTA revenue,

with recent earnings of approximately $10 million per year. The TEAJF distributes these funds to various non-profit organizations who apply to the TEAJF for funding.

*Procedural History*

The plaintiffs' objections to the activities of some of the IOLTA fund recipients, such as those groups providing legal aid to refugees seeking political asylum in the United States and those organizations assisting death row inmates to challenge their death sentences, prompted them to bring this suit.[10] The plaintiffs allege that the IOLTA program constitutes an impermissible taking of property, in violation of the Fifth Amendment of the United States Constitution, and that the program also forces them to support speech that they find offensive, in violation of the First Amendment. The plaintiffs request compensation for the interest proceeds that the Texas IOLTA program earned from their deposit and an injunction against the further application of the Texas IOLTA program.

---

[8]TEX.GOV'T CODE ANN. tit. 2, subtit. G, app. A, art. 11 § 5 (West Supp.1995) (emphasis added).

[9]TEAJF rule 6.

[10]The plaintiffs consist of Michael J. Mazzone, a Texas attorney who regularly places clients' funds into an IOLTA account and who asserts that practical problems prevent him from practicing law without collecting nominal or short-term client funds; William J. Summers, a Texas citizen who has funds currently held in an IOLTA account and who regularly uses Texas attorneys; and the Washington Legal Foundation, a public interest law firm whose members are similarly situated to Mazzone and Summers.

The defendants[11] moved to dismiss the case for failure to state a claim. Though the district court denied this motion, it granted the defendants' subsequent motion for summary judgment and denied the plaintiffs' summary judgment motion. The district court, finding the logic of the First and Eleventh Circuits "compelling",[12] reasoned that there was no property interest at stake in the interest proceeds earned on funds deposited in IOLTA accounts.[13] Having made this determination, the district court then dismissed the plaintiffs' First and Fifth Amendment arguments.[14] The district court concluded by holding that the TEAJF is entitled to Eleventh Amendment immunity against all of the plaintiffs' claims and that Newton is subject only to the plaintiffs' claims of injunctive and prospective relief. The plaintiffs now appeal the district court's decision.

II.

It has been suggested that the IOLTA program represents a successful, modern-day attempt at alchemy.[15] While legends abound concerning the ancient, self-professed alchemists who worked tirelessly towards their goal of changing ordinary metal into precious gold, modern society generally scoffs at this attempt to create "something from nothing". The defendants in this case denounce such skepticism, declaring that they have unlocked the magic that eluded the alchemists. The alchemists failed because the necessary ingredients for their magic did not exist in historical times: the combination of attorney's client funds and anomalies in modern banking regulations. According to the defendants' theory, the interest proceeds generated by Texas's IOLTA accounts exist solely because of an anomaly in banking regulations and, until the creation of the IOLTA program, that

---

[11]In its suit, the plaintiffs named as defendants the TEAJF; W. Frank Newton, the director of the TEAJF; and all the Justices of the Texas Supreme Court.

[12]*Washington Legal Found. v. Texas Equal Access to Justice Found.,* 873 F.Supp. 1, 6-7 (W.D.Tex.1995) (citing *Washington Legal Found. v. Massachusetts Bar Found.,* 993 F.2d 962, 975-76 (1st Cir.1993) and *Cone v. State Bar of Fla.,* 819 F.2d 1002, 1004 (11th Cir.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987)).

[13]*Id.* at 7.

[14]*Id.* at 8, 10.

[15]AMERICAN BAR ASS'N, CIVIL JUSTICE: AN AGENDA FOR THE 1990'S 56-72 (1989).

5

interest belonged to no one. The defendants then contend that Texas used the IOLTA program to stake a legitimate claim to these funds and that the plaintiffs cannot now seek to repossess the fruits of this magic as their own. We, however, view the IOLTA interest proceeds not as the fruit of alchemy, but as the fruit of the clients' principal deposits.

State law defines "property" and the United States Constitution protects private property from government encroachment.[16] Texas observes the traditional rule that "interest follows principal", which recognizes that interest earned on a deposit of principal belongs to the owner of the principal.[17] In the light of this rule, it seems obvious that the interest earned in the IOLTA accounts is the property of the clients whose money is held in those accounts; nevertheless, the district court adopted the theory espoused by the First and Eleventh Circuits, which circumvents this rule. The district court concluded that the plaintiffs cannot "have a [cognizable] property interest in interest proceeds that, but for the IOLTA Program, would have never been generated".[18] This reasoning, though, does not give proper weight to Supreme Court precedent.

In *Webb's Fabulous Pharmacies v. Beckwith,* the Supreme Court addressed a similar situation.[19] The case arose when the purchase of Webb's Fabulous Pharmacies faltered because, at the closing, the purchaser learned that Webb's had substantial debt that was not previously revealed. The purchaser then filed a complaint of interpleader in Florida state court and tendered the $1.8 million purchase price to the clerk of court. Florida law required the clerk to place the interpleaded funds into an interest-bearing account, to retain the interest earned for the court, and to deduct statutorily-defined fees for maintaining the funds. During the following year while the matter was

---

[16]*Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 450-51, 66 L.Ed.2d 358 (1980) (citing *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).

[17]*E.g., Sellers v. Harris County,* 483 S.W.2d 242, 243 (Tex.1972).

[18]*Washington Legal Found.,* 873 F.Supp. at 7 (citing *Massachusetts Bar Found.,* 993 F.2d at 980; *Cone,* 819 F.2d at 1005-07).

[19]449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).

being resolved, the interpleaded funds earned over $100,000 in interest. The court then appointed a receiver for Webb's, who promptly demanded that the clerk deliver the funds to him. The clerk surrendered the funds, but withheld approximately $10,000 for administrative fees and the $100,000 in interest that had accrued. The creditors then filed suit in state court to recover the interest. Ultimately, the Florida Supreme Court ruled against the creditors, holding that there was no unconstitutional taking because money deposited with the clerk was public money, interest earned on public money was not private property, and the statute only took that which it created.[20] This decision prompted the creditors to appeal to the United States Supreme Court.

The Supreme Court began by noting that the principal deposited with the clerk clearly constituted private property under Florida law.[21] The Court then determined that because the principal was "held only for the ultimate benefit of Webb's creditors, not for the benefit of the court"[22] and eventually would be distributed to them, state law gave the creditors a property interest proportional to their share of the principal.[23]

Having decided the ownership of the principal, the Court turned to the interest on the principal, "the fruit of the fund's use".[24] Reaching the opposite conclusion from that of the Florida Supreme Court,[25] the *Webb's* Court held that simply because the state ordered the placement of interpleaded funds into an interest-bearing account does not mean that the state can assert ownership

---

[20]*Beckwith v. Webb's Fabulous Pharmacies,* 374 So.2d 951, 952-53 (Fla.1979) (per curiam), *rev'd, Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).

[21]*Webb's Fabulous Pharmacies,* 449 U.S. at 160, 101 S.Ct. at 450.

[22]*Id.* at 161, 101 S.Ct. at 451.

[23]*Id.*

[24]*Id.* at 162, 101 S.Ct. at 451.

[25]*Beckwith,* 374 So.2d at 953 (finding no unconstitutional taking because the IOLTA program only took the interest that it created).

of that interest.[26] Recognizing that "[t]he usual and general rule [under Florida law] is that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal", the Court ruled that "earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property".[27] The Court then concluded that the Florida law perpetrated an unconstitutional taking of the interest, which is the property of the creditors who own the principal.[28]

After *Webb's,* numerous state courts debated the constitutionality of IOLTA programs. With the exception of the Indiana Supreme Court,[29] these courts agreed that *Webb's* was inapposite because of the difference in size between the deposit in *Webb's* and the funds eligible for deposit in IOLTA accounts.[30]

In 1987, the Eleventh Circuit considered the IOLTA issue in a suit challenging Florida's version of the IOLTA program.[31] The Eleventh Circuit distinguished *Webb's* on the basis that *Webb's*

---

[26]*Id.* at 162, 101 S.Ct. at 451.

[27]*Id.* at 162-63, 101 S.Ct. at 451-52.

[28]*Id.* at 163, 101 S.Ct. at 451-52.

[29]The Indiana Supreme Court refused to implement an IOLTA program, concluding that the program diverts clients' funds, because the interest proceeds belong to the clients, and convolutes attorneys' fiduciary duty to their clients. *In re Ind. State Bar Ass'ns Petition to Authorize a Program Governing Interest on Lawyers' Trust Accounts,* 550 N.E.2d 311, 312-15 (Ind.1990) (per curiam).

[30]*See In re Ark. Bar Ass'n Petition to Authorize a Program Governing Interest on Lawyer's Trust Accounts,* 283 Ark. 252, 675 S.W.2d 355, 357 (1984), *modified,* 289 Ark. 595, 709 S.W.2d 400 (1986); *Carroll v. State Bar of Cal.,* 166 Cal.App.3d 1193, 213 Cal.Rptr. 305, 312, *cert. denied,* 474 U.S. 848, 106 S.Ct. 142, 88 L.Ed.2d 118 (1985); *In re Interest on Trust Accounts,* 402 So.2d 389, 395-96 (Fla.1981); *Petition by the Mass. Bar Ass'n,* 395 Mass. 1, 478 N.E.2d 715, 718 (1985); *In re Petition of Minn. State Bar Ass'n,* 332 N.W.2d 151, 158 (Minn.1982); *Petition of N.H. Bar Ass'n,* 122 N.H. 971, 453 A.2d 1258, 1261 (1982); *In re Interest on Lawyers' Trust Accounts,* 672 P.2d 406, 408 (Utah 1983). While forty-nine states and the District of Columbia have adopted an IOLTA program in one form or another, *In re Indiana State Bar Ass'n,* 550 N.E.2d at 311, most states adopted the program without opinion or through legislation.

[31]*Cone,* 819 F.2d at 1002. The Florida IOLTA program was "voluntary", giving its attorneys the option of whether to participate. The clients, however had no choice, other than to choose an attorney who did not use the program. In *Cone,* the plaintiff paid her attorneys $100 to probate

8

involved the ownership of over $100,000 in accrued interest, an amount that clearly exceeded any fees that were assessed.[32] In contrast, the Florida IOLTA program only concerned deposits that were so small or short-term that the administrative costs of maintaining an interest-bearing NOW account for that deposit would exceed any interest earned.[33] Relying on this factual distinction, the Eleventh Circuit concluded that Florida's IOLTA program does not commit an unconstitutional taking, reasoning that the owner of principal has no legitimate expectation of earning interest on money deposited into a Florida IOLTA account because "the use of [the client's] money had no net value, therefore there could be no property interest for the state to appropriate".[34] According to the Eleventh Circuit, the use of the money had no net value because the IOLTA program only takes the interest from those deposits that do not produce interest in excess of the administrative expenses incurred.[35]

Although the Eleventh Circuit explicitly says otherwise,[36] inherent in its *Cone* analysis is the notion that the value of the alleged pro perty involved determines whether there is a cognizable property interest. Under *Cone*, " 'property' is [erroneously] redefined as an interest that must

---

her husband's estate. The attorneys failed to return $13.75 of that amount to the plaintiff, which, during the following eleven years, earned $2.25 in interest. The plaintiff's attorneys paid that interest to Florida's IOLTA program and the plaintiff sued to recover that interest.

[32]*Id.* at 1007.

[33]*Id.* at 1006-07.

[34]*Id.* at 1007.

[35]*Id.* The First Circuit, in dicta, reached the same conclusion. *See Massachusetts Bar Found.,* 993 F.2d at 976. In that case, the First Circuit stated that the plaintiffs did not assert property rights in the IOLTA interest proceeds, but sought only to protect the right to exclude the state from the use of their principal. *Id.* at 975-76. The right to exclude is one of the sticks in the bundle of property rights. *Id.* The Court, nevertheless, held that the interest earned on IOLTA accounts was not the plaintiff's property, *id.* at 976, an issue that was not properly before it. The First Circuit employed reasoning that parallels the decision in *Cone,* concluding that the IOLTA interest belongs to no one. *Id.* at 980.

[36]*Cone,* 819 F.2d at 1007 (stating that the decision does not establish "a de minimis standard for Fifth Amendment takings").

necessarily benefit its owner".[37] The *Webb's* decision, however, creates a rule that is independent of the amount or value of interest at issue, holding that a property interest existed in the accrued interest simply because "[t]he earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property".[38] We see no reason why this rule does not apply to the instant case.

The *Cone* Court also failed to consider the precise events of the transaction, concluding that the only protectable property interest in interest proceeds attaches to the amount of interest that remains after a bank deducts its charges from the interest earned, because the owner of the principal only has a legitimate expectation of receiving those interest proceeds.[39] It appears, however, that a bank pays interest on the account and then deducts fees. It is a two-part process. As a result, a

[37]Mary O. Sinibaldi, Note, *The Takings Issue in California's Legal Services Trust Account Program,* 12 HASTINGS CONST.L.Q. 463, 492 (1985).

[38]*Webb's Fabulous Pharmacies,* 449 U.S. at 164, 101 S.Ct. at 452. The *Webb's* Court concluded by holding that the Florida statute appropriated "the value of the use of the fund for the period in which it is held". *Id.; see also* Sinibaldi, *supra* note 37, at 493.

The *Cone* Court was correct to note that the value of the property involved does not effect the determination of whether a property interest exists; indeed, the Supreme Court rejected this position in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), in which the Court held that "constitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occupied". *Id.* at 436, 102 S.Ct. at 3176-77 (ruling that an ordinance requiring landlords to allow cable television providers to install small cable boxes on the roofs of their buildings was a permanent physical occupation, thereby entitling the landlords to compensation despite the small area appropriated and the fact that the installation actually enhanced the value of the buildings).

The defendants in the instant case suggest that *Loretto* does not govern IOLTA because money, unlike real property, is fungible and deductions from the IOLTA account are not physical appropriations of property. *Cf. United States v. Sperry Corp.,* 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 394-95 n. 9, 107 L.Ed.2d 290 (1989) (holding that the government did not perpetrate a taking when it deducted a statutory fee from the plaintiff's award by the Iran-United States Claims Tribunal instead of requiring the plaintiff to pay the fee separately). This argument is inappropriate because this suit does not concern the constitutionality of deductions for the maintenance of the IOLTA accounts, but rather addresses the ownership of the interest generated. *See id. Sperry* merely confirms that the state may charge fees to those who use its services, and may deduct those fees directly from any amount due to the user.

[39]*Cone,* 819 F.2d at 1007.

property interest attaches the moment that the interest accrues, from which the bank then deducts its charges from the depositor's account. Furthermore, the *Webb's* Court noted that Florida was under no obligation to place the interpleaded funds into an interest-bearing account, but once it did so, then any interest earned belongs to the depositor. The same rule applies to IOLTA accounts. Ethical rules historically demanded that attorneys hold their clients' funds in trust accounts, choosing the type of account in accordance with the best interests of the client. If attorneys still had this latitude, clients could not complain that a taking occurred when the attorney placed their funds in a non-interest bearing account, because until the interest accrues, the clients have no cognizable property right in the interest.[40] The Texas IOLTA program, however, requires attorneys to place certain client funds into an IOLTA account and then takes the interest that accrues for itself. In such a case, the plain rule is that the interest proceeds, once they have accrued, belong to the owner of the principal.

The defendants additionally argue that finding a property interest in the IOLTA interest overlooks the fact that, for practical banking reasons, the interest earned in trust accounts could never accrue to the clients. This argument ignores one of the critical driving forces of IOLTA: IOLTA programs became possible only with the announcement of Internal Revenue Service ruling 81-209.[41] In this ruling, the I.R.S. agreed that clients would not be taxed on the interest earned on their deposits in IOLTA accounts provided that they had no choice but to parti cipate in the program.[42] By the terms of this ruling, if clients have any control over the interest generated from their nominal and short-term deposits into IOLTA accounts, then the interest generated is taxable income.[43] To prevent

[40]*See Webb's Fabulous Pharmacies,* 449 U.S. at 161, 101 S.Ct. at 451 ("[A] mere unilateral expectation ... is not a property interest entitled to protection.")

[41]Rev.Rul. 81-209, 1981-2 C.B. 16; *see also* Rev.Rul. 87-2, 1987-1 C.B. 18 (restating the decision announced in Rev.Rul. 81-209).

[42]Rev.Rul. 81-209, 1981-2 C.B. at 17 (justifying the tax-exempt status of IOLTA interest because under IOLTA plans, "no client may individually elect whether to participate in the program" and "bars clients from receiving the benefit of any interest earned").

[43]The I.R.S. was concerned about IOLTA programs providing a means to assign income and to avoid taxes on that income. By prohibiting clients from having any control over IOLTA funds, the I.R.S. is satisfied that the assignability problem is mooted.

this situation, Texas gave itself an IOLTA monopoly, reserving all the IOLTA interest proceeds for itself and requiring all of its attorneys to participate in the program. If private charities were to establish private IOLTA programs and clients could choose the program to which their funds went, then clients suddenly would have taxable income. Applying the defendants' arguments to such a scenario, the IOLTA funds would be too minimal to return to the clients, therefore falling outside of the *Cone* definition of property, yet clients still would have to pay income tax on the interest earned, interest which *Cone* would say was not their property. This situation flies in the face of reason.

We are also hesitant to declare that such interest is not property lest we incite a new gold rush, encouraging government agencies to dissect banking regulations to discover other anomalies that lead to "unclaimed" interest. One possible source is the interest earned by banks during the float time of checks. Consider a customer who deposits a check drawn on a payor bank with a depositary bank. "In a simple case, where the Federal Reserve Bank is the only intermediary, the depositary bank will present that check to the Fed and receive a [provisional] credit in its reserve account."[44] The Fed then presents the check to the payor bank, whose account is debited and the payor bank must send notice of dishonor within the defined period or be liable for the amount.[45] Typically, this process takes one to two days, during which time the depositary bank has a provisional credit from the Federal Reserve in the amount of the check. Until recently, depositary banks were not required to pay interest to their customers during the time between the deposit of funds and the payor banks' deadline to send the notice of dishonor, effectively giving the depositary banks an interest-free loan on the deposited funds during that time because the depositary banks could treat the provisional credit like cash reserves. This interest-free loan appears very similar to the one that the Texas Supreme Court sought to exploit with the IOLTA program and the interest earned on some checking accounts conceivably could fall below any benefits received, creating an IOLTA-like situation. While

---

[44]Robert D. Cooter & Edwin L. Rubin, *Orders and Incentives as Regulatory Methods: The Expedited Funds Availability Act of 1987,* 35 U.C.L.A.L.REV. 1115, 1127 (1988).

[45]*See id.*

depositary banks now must pay interest on deposits from the time that they receive provisional credit from the Fed, credit unions are exempt from this requirement and still receive the benefit of these "interest-free loans".[46]

This is only one example of another "anomaly" in the banking industry and we cannot believe that such anomalies each create funds that belong to nobody. The traditional rule that interest follows principal must apply because that rule compensates the owners of the principal for the use of their funds. If a bank customer chooses, however, to allow the bank to profit in this manner, that decision does not give the state carte blanche to claim that property as its own. As technology continues to advance, the speed with which such transactions can occur will continue to increase, providing greater opportunities for states to try to collect the fractions of pennies that could be earned as interest during the float time of all these activities. Indeed, the faster the funds move, the more and more difficult it will be for individuals to make a practical claim to such funds. Nevertheless, the rule remains the same: any interest that accrues belongs to the owner of the principal, unless they agree otherwise.[47]

## III.

The district court's decision on the merits is wholly premised on the notion that clients do not have a valid property interest in the interest proceeds earned on funds in IOLTA accounts. Having rejected this premise, we vacate the district court's award of summary judgment to the defendants and denial of summary judgment to the plaintiffs. We remand this case for reconsideration in the light of the principles explained in this decision and for further factual development of the record, such as the

---

[46]*See* 12 U.S.C.A. § 4005(a), (b) (West 1989).

[47]Furthermore, we also note that under the current IOLTA program, tax law seemingly defines property. If interest was no longer taxed, banks would not have to send 1099s, thereby greatly decreasing the administrative costs of IOLTA accounts. In this case, nearly all deposits would earn interest and clients clearly would be entitled to their funds. We find no basis to hinge property interests on the fickle tax code. Under the current scheme, any change in the costs to banks of managing small deposits would impact the determination of whether a property right in IOLTA interest exists. *See* Kenneth P. Kreider, Note, *Florida's IOLTA Program Does Not "Take" Client Property for Public Use,* 57 U.CIN.L.REV. 369, 391-93 (1988). This short-sighted view of property renders it unacceptable.

clarification of the types of account pooling permitted by the TEAJF rules.

With respect to the merits of the plaintiffs' claims, we note that to prevail on their taking claim, the plaintiffs must demonstrate that the taking was against the will of the property owner.[48] That or a similar showing would also likely be necessary to prevail on their First Amendment claim. We express no opinion as to whether such a showing has been, or can be, made in the context of this case. We leave these and such other issues as may surface to be addressed in the first instance by the district court on remand.

IV.

Finally, the district court also granted the defendants' request for immunity under the Eleventh Amendment with respect to the plaintiffs' claim for monetary restitution. The parties now only dispute whether the district court erred by declaring the defendants immune to the plaintiffs' restitution claim. The parties do not seriously challenge this portion of the district court's ruling; the defendants concede that they are subject to the plaintiffs' prospective injunction claims and the plaintiffs admit that their "principal concern all along has been in obtaining prospective injunctive relief". We suggest another reason for the parties' lackadaisical approach to this part of the decision: they realize that the district court is correct.

The Eleventh Amendment shields states and their agencies from suits in federal court without the states' consent.[49] Initially, we note that the Texas Supreme Court is entitled to Eleventh Amendment immunity.[50] This immunity extends to the TEAJF because the Texas Supreme Court created the TEAJF pursuant to its rule-making authority and the TEAJF acts on behalf of the Texas Supreme Court to carry out its role, which the Texas Supreme Court defined.[51] Similarly, defendant

---

[48]*See Yee v. City of Escondido,* 503 U.S. 519, 527, 112 S.Ct. 1522, 1528, 118 L.Ed.2d 153 (1992).

[49]*Word of Faith World Outreach Ctr. Church v. Morales,* 986 F.2d 962, 965 (5th Cir.), *cert. denied,* 510 U.S. 823, 114 S.Ct. 82, 126 L.Ed.2d 50 (1993).

[50]*See Lewis v. Louisiana State Bar Ass'n,* 792 F.2d 493, 497 (5th Cir.1986).

[51]*See id.* at 497 & n. 4.

14

Newton is entitled to immunity because he is being sued in his official capacity as chairman of the TEAJF, and therefore is also a state actor. The immunity that applies, as held by the district court, is limited and protects the defendants only from the plaintiffs' claims for reimbursement because the Eleventh Amendment does not protect the state from federal suits seeking injunctive relief.[52] Accordingly, we hold that the district court did not err on this issue.

V.

For the foregoing reasons, we find that the district court erred by holding that the clients do not have a cognizable property interest in the interest proceeds that are earned on their deposit in IOLTA accounts. We VACATE the district court's award of summary judgment for the defendants and denial of summary judgment for the plaintiffs and REMAND for further consideration. Finally, we AFFIRM the limited immunity that the district court granted to the defendants.

---

[52]*Word of Faith,* 986 F.2d at 965 (5th Cir.); *see also Lewis,* 792 F.2d at 497. The parties also disagree over whether the plaintiffs are entitled to monetary relief under their 42 U.S.C. § 1983 claim for monetary damages. Because neither a state nor state officials sued in their official capacity are "persons" within the meaning of § 1983 when the relief sought is monetary, the plaintiffs cannot recover their claim for reimbursement from the defendants. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 69-71 & n. 10, 109 S.Ct. 2304, 2311-12 & n. 10, 105 L.Ed.2d 45 (1989).