**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**No. 00-50139**

---

**WASHINGTON LEGAL FOUNDATION; WILLIAM R. SUMMERS;**
**and MICHAEL J. MAZZONE,**

Plaintiffs-Appellants,

**versus**

**TEXAS EQUAL ACCESS TO JUSTICE FOUNDATION; RICHARD TATE,**
Chairman, Texas Equal Access to Justice Foundation;
**THOMAS R. PHILLIPS, Chief Justice; NATHAN L. HECHT, Justice;**
**CRAIG ENOCH, Justice; JAMES A. BAKER, Justice;**
**PRISCILLA R. OWENS, Justice; GREG ABBOTT, Justice;**
**DEBORAH HANKINSON, Justice; HARRIET O'NEILL, Justice;**
**SUPREME COURT DEFENDANTS,**

Defendants-Appellees.

---

**Appeal from the United States District Court**
**for the Western District of Texas**

---

October 15, 2001

Before WIENER, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The Supreme Court having held in this case that, for purposes of the Takings Clause of the Fifth Amendment, interest earned on client-funds deposited in demand accounts pursuant to the Texas Interest on Lawyers Trust Accounts (IOLTA) program is the "private property" of the client, ***Phillips v. Washington Legal Foundation***, 524 U.S. 156, 160, 172 (1998), and the Court having remanded this case for consideration, *inter alia*, of two other subparts of the Takings Clause (whether there has been a "taking" and, if so, what

"just compensation", if any, is due, *id*. at 172), and the district court, following a bench trial on remand, having concluded, *inter alia*, there was neither a compensable loss nor a taking, the principal issues at hand are: whether there can be a taking when, without the cost-savings provided by the IOLTA program, client-funds would not earn "net" interest; and whether, even if there is a taking, prospective injunctive relief can be a remedy.

Because we hold that the Fifth Amendment is violated, we need not reach Appellants' claim that the IOLTA program violates the First Amendment as well. **REVERSED** and **REMANDED**.

I.

The requisite underlying facts have been fully discussed in prior opinions by the Supreme Court and our court. *See **Phillips v. Washington Legal Found.***, 524 U.S. 156 (1998); ***Washington Legal Found. v. Texas Equal Access to Justice Found.***, 94 F.3d 996 (5th Cir. 1996). They are restated here, together with pertinent new facts.

When attorneys hold their clients' funds, Texas ethical rules require placing those funds in a trust account that permits withdrawal on demand. TEX. DISCIPLINARY RULES OF PROFESSIONAL CONDUCT, Art. 10, § 9, Rule 1.14(a). Those rules allow attorneys to aggregate client-funds in a single trust account, but, of course, prohibit attorneys from commingling their money with the trust fund. **Id.** Prior to 1980, because federal law prohibited banks from paying

2

interest on demand accounts, these accounts were, in effect, interest-free loans to the banks. *See* S. Rep. No. 96-368, at 5 (1980), *reprinted in* 1980 U.S.C.C.A.N. 236, 240.

In 1980, Congress enacted legislation that allowed negotiable order of withdrawal (NOW) accounts. *See* Depository Institutions Deregulation and Monetary Control Act of 1980, 94 Stat. 132, 146 (codified as amended at 12 U.S.C. § 1832). In general, NOW accounts allow attorneys to pool client-funds in an interest-bearing trust account.[1]

The creation of NOW accounts led to the creation of IOLTA programs. When either the amount of a client's funds to be held is nominal or the period of time for which the funds will be held is brief, a NOW account for such client-funds is not feasible, because the cost of maintaining the account is greater than the interest the client would have earned (*no* "net interest"). As discussed *infra*, such costs are those incurred not only by the bank, but also by the attorney. In this situation, the trust accounts are — as they were formerly — interest-free loans to the banks. IOLTA programs transfer this benefit from the bank to legal providers for the

---

[1]None of the funds may belong to a for-profit corporation or partnership. 12 U.S.C. § 1832(a)(2). *But see* Letter from Federal Reserve Board General Counsel Michael Bradfield to Donald Middlebrooks (15 Oct. 1981), *reprinted in* Middlebrooks, **The Interest on Trust Accounts Program: Mechanics of its Operation**, 56 FLA. B.J. 115, 117 (Feb. 1982) (concluding corporate funds may be held in NOW accounts *if* charitable organizations have exclusive right to interest generated by funds).

indigent. Based on the assumption — later held erroneous in *Phillips* — that the interest generated was not the client's property, the American Bar Association's Standing Committee on Ethics and Professional Responsibility opined that IOLTA programs are ethical. *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 348 (1982).

The Texas Supreme Court created its IOLTA program in 1984. The program was voluntary, permitting an attorney to place client- funds that were "nominal in amount" or "reasonably anticipated to be held for a short period of time" in an unsegregrated, interest-bearing bank account (an IOLTA account), the interest on which was paid to the Texas Equal Access to Justice Foundation (TEAJF), a non-profit corporation created by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. tit. 2, subtit. G, app. A, art. 11 §§ 6-7 (1987). TEAJF manages the interest earned from the IOLTA accounts and distributes it to non-profit organizations that "have as a primary purpose the delivery of legal services to low income persons", with the exception that funds may not be used to finance class actions or to lobby on behalf of a political candidate or issue. *See* TEXAS RULES OF COURT - STATE, Rules Governing the Operation of the Texas Equal Access to Justice Program [TEAJF rule] rule 10, 15 (West 1996).

Texas' voluntary IOLTA program generated only $1 million annually. Therefore, in 1988, following the lead of several other States and the recommendation of the American Bar Association, the

4

Texas Supreme Court made mandatory attorney participation in the IOLTA program.

> An attorney ... receiving in the course of the practice of law ... client funds that are *nominal in amount* or are *reasonably anticipated to be held for a short period* of time, *shall* establish and maintain a separate interest-bearing demand account at a financial institution and *shall* deposit in the account all those client funds.

TEX. GOV'T CODE ANN. tit. 2, subtit. G, app. A, art. 11 § 5 (West Supp. 1995) (emphasis added). The rules define which funds are "nominal in amount" and/or "held for a short period of time". They state that a client's funds may be deposited in an IOLTA account only if the attorney holding the funds determines they

> could *not* reasonably be expected to earn interest for the client *or* if the interest which might be earned on such funds is *not likely* to be sufficient to *offset the cost* of establishing and maintaining the account, service charges, accounting costs and tax reporting costs which would be incurred in attempting to obtain interest on such funds for the client.

TEAJF rule 6 (emphasis added).[2]

---

[2]When **Phillips** was decided, the parties agreed that the portion of then TEAJF rule 6 prohibiting attorneys from pooling clients' funds in one account in an effort to generate net interest for the clients was *not* enforced. **Phillips**, 524 U.S. at 169. That portion was omitted in the January 1999 revision to the TEAJF rules. TEAJF rule 6.

Consistent with the following ruling in **Phillips**, this rule-change does not affect our analysis concerning whether there has been a taking.

Whether client funds held in IOLTA

The January 1999 guidelines to the TEAJF rules provide attorneys "should consider all costs associated with such an account" in determining whether a client's funds are suitable for deposit in the program. But, W. Frank Newton, past chair of TEAJF and member of its board of directors, testified that attorneys may disregard their overhead costs. (As Appellees note, the guidelines have been revised — approximately when the trial on remand was held in September 1999 — to provide that attorneys may consider all costs associated with such an account.)

Attorneys must review periodically whether changed circumstances require removing a client's funds from an IOLTA

---

accounts could generate net interest [for a client] is a matter of some dispute. As written [(prior to the above-referenced January 1999 TEAJF rules-revision)], the Texas IOLTA program requires the calculation as to net interest to be made "without regard to funds of other clients which may be held by the attorney." [TEAJF] Rule 6. This provision would deny to an attorney the traditional practice of pooling funds of several clients in one account, a practice which *might* produce net interest when opening an account for each client would *not*. But in the District Court, petitioners [(Appellees here)] agreed that this portion of the rule was *not* to be enforced, and that an attorney could make the necessary calculation on the basis of pooled accounts. Petitioners made a similar concession during oral argument here. Tr. of Oral Arg. 13-16. We accept this concession but find that it does *not* avail petitioners.

*Phillips*, 524 U.S. at 169 (emphasis added).

6

account.  TEAJF rule 6.  Along this line, if an attorney determines funds were erroneously placed in an IOLTA account, he must notify TEAJF and seek a refund of the interest earned.

The mandatory IOLTA program generated much more revenue than its predecessor.  Recent earnings approximate over $5 million annually.

As noted, Texas' IOLTA program was made mandatory in 1988.  In 1994, Michael J. Mazzone, a Texas attorney who regularly places client-funds in an IOLTA account,[3] William R. Summers, a Texas citizen who currently has funds in an IOLTA account, and Washington Legal Foundation, a public interest law firm with members similarly situated to Mazzone and Summers (Appellants), filed this action against the Texas IOLTA program, naming as defendants TEAJF, TEAJF's chairman, and the nine Justices of the Texas Supreme Court (Appellees).  Appellants claimed:  the IOLTA program impermissibly takes interest earned from client-funds, in violation of the Fifth Amendment; and the program forces Appellants to support speech they find offensive, in violation of the First Amendment.  Appellants sought monetary reimbursement, as well as declaratory and injunctive relief.

The district court granted Appellees' motion for summary judgment, concluding clients lacked property rights in the interest

---

[3]Mazzone's unopposed 29 May 2001 motion (post-oral argument) to dismiss his appeal was denied.  *See* FED. R. APP. P. 42(b) ("An appeal may be dismissed on the appellant's motion on terms agreed to by the parties or fixed by the court.").

generated by their funds. *Washington Legal Found. v. Texas Equal Access to Justice Found.*, 873 F. Supp. 1, 7 (W.D. Tex. 1995). But, through an opinion authored by the late Judge John Minor Wisdom, our court reversed in part, holding the interest was the clients' property. *Washington Legal Found.*, 94 F.3d at 1000. On the other hand, our court affirmed the district court's conclusion that Appellees have Eleventh Amendment immunity from the monetary-restitution claim. *Id.* at 1005.

The Supreme Court granted certiorari, limiting its review to: "Is interest earned on client trust funds held by lawyers in IOLTA accounts a property interest of the client or lawyer, cognizable under the Fifth Amendment of the United States Constitution, *despite the fundamental precept of IOLTA that such funds, absent the IOLTA program, could [not] earn interest for the client [or] lawyer*?". *Phillips v. Washington Legal Found.*, 521 U.S. 1117 (1997) (emphasis added). In June 1998, the Court affirmed, stating the issue to be "whether interest earned on client-funds held in IOLTA accounts is 'private property' of either the client or the attorney for purposes of the Takings Clause", and holding the interest is the property of the client. *Phillips*, 524 U.S. at 160. In the light of its "hold[ing] that the interest income generated by funds held in IOLTA accounts is the 'private property' of the owner of the principal [,the client,]", *id*. at 172, the Court remanded for further proceedings, including a determination of whether the interest has

8

been "taken" by the State and the amount of "just compensation", if any, due. *Id.*

A bench trial was held in September 1999. In January 2000, the district court granted the Texas Supreme Court Justices' motion for judgment on the pleadings, holding the Justices are legislatively immune from suit. *Washington Legal Found. v. Texas Equal Access to Justice Found.*, 86 F. Supp. 2d 617, 624 (W.D. Tex. 2000). Later that month, the court dismissed the remaining claims, concluding the IOLTA program was not violative of either the Fifth or First Amendments. *Washington Legal Found. v. Texas Equal Access to Justice Found.*, 86 F. Supp. 2d 624, 636, 643 (W.D. Tex. 2000). Regarding the taking claim, the court concluded that the "just compensation" subpart of the Takings Clause had not been violated; this was premised on its conclusion that Appellants failed to show an identifiable compensable loss because a client's IOLTA-deposit funds cannot generate "net interest" without the IOLTA program. *Id.* at 643. Again, by "net interest", the court meant interest in excess of the costs associated with establishing and maintaining an interest-bearing demand account. *Id.* at 628 (citing TEAJF rule 6); *see also* TEAJF rule 4B. In the alternative, and applying the ad hoc analysis referenced *infra*, the court concluded there had been no taking. *Id.* at 643-47.

II.

The district court's conclusions of law are reviewed *de novo*; its findings of fact, for clear error. *E.g., **Dunbar Med. Sys., Inc. v. Gammex Inc.***, 216 F.3d 441, 448 (5th Cir. 2000). Of course, whether public interests are served by Texas' IOLTA program is not the question. Instead, at issue is the constitutionality *vel non* of the program. Because Appellants' Fifth Amendment claim has merit, we do not reach their claim that the IOLTA program violates their First Amendment rights by forcing them to finance speech they find objectionable.

The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, provides: "nor shall private property be taken for public use, without just compensation". U.S. CONST. amend. V; ***Phillips***, 524 U.S. at 163-64. Appellants have met their burden of demonstrating the existence of a property interest. ***Id.*** at 172. And, there is no dispute that "private property" has been allocated "for public use". Therefore, has there been a "taking"? If so, what "just compensation", if any, is due?

A.

For determining whether there has been a taking, Appellants urge use of the per se analysis; Appellees, the ad hoc inquiry set forth in ***Penn Central Transportation Co. v. City of New York***, 438 U.S. 104, 124 (1978) (three factors of "particular significance": economic impact of regulation; extent of interference with distinct

10

investment-backed expectations; and character of governmental action).

On remand, the district court first rejected using the per se analysis, and then applied the ad hoc method. *Washington Legal Found.*, 86 F. Supp. 2d at 643-47. We conclude, however, that *Phillips*, and *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980), and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), cases the *Phillips* Court relied upon in reaching its property interest holding, compel applying the per se analysis.[4]

*Webb's*, 449 U.S. at 155-56, the case most factually similar to the one at hand, involved a state statute pursuant to which, in addition to charging a fee for the clerk's services in receiving an interpleader fund into the registry of its court, a county took the interest accruing on that deposited fund. Citing *Penn Central*, but not engaging in the ad hoc analysis articulated in it, the Court first noted it "has been permissive in upholding" governmental action that denies a property owner the full use of his property, if that action promotes the general welfare. *Id.* at 163.

> [For the governmental action at issue in
> *Webb's*], however, [the government] has not
> merely adjusted the benefits and burdens of

---

[4]Likewise, in a similar IOLTA case, a panel of the Ninth Circuit recently applied the per se analysis. *Washington Legal Found. v. Legal Found. of Wash.*, 236 F.3d 1097, 1111 (9th Cir. 2001). But, rehearing en banc was granted on 9 May 2001. *Washington Legal Found. v. Legal Found. of Wash.,* 248 F.3d 1201 (9th Cir. 2001).

> economic life to promote the common good.
> Rather, the exaction is a *forced contribution*
> to general governmental revenues, and it is not
> reasonably related to the costs of using the
> courts.

*Id.* (emphasis added; internal quotation marks and citation omitted).

The exaction was found similar to that in *United States v. Causby*, 328 U.S. 256 (1946):  "The county's appropriation of the beneficial use of the fund is analogous to the appropriation of the use of private property in ... *Causby*".  *Webb's*, 449 U.S. at 163-64.

In *Causby*, 328 U.S. at 258-59, the Government's use of air space above private property as part of the flight plan for military aircraft was held to be a taking:  the appropriation destroyed the use of the land as a chicken farm.  *Causby* was decided *before* the per se takings analysis was articulated.  But, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992), classified *Causby* as involving a "physical invasion of property", one of "at least two distinct categories of regulatory action ... compensable without case-specific inquiry into the public interest advanced in support of the restraint".[5]  Continuing the discussion of the per se analysis, and of great significance to the taking issue presented by the case at hand, the Court stated:

> In general (at least with regard to permanent
> invasions), no matter how minute the intrusion,

---

[5]The second type listed was "where regulation denies all economically beneficial or productive use of land".  *Lucas*, 505 U.S. at 1015.

12

and no matter how weighty the public purpose behind it, we have required compensation. For example, in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), we determined that New York's law requiring landlords to allow television cable companies to emplace cable facilities in their apartment buildings constituted a taking, *id.*, at 435-440, even though the facilities occupied at most only 1 ½ cubic feet of the landlords' property, see *id.*, at 438, n.16. See also *United States v. Causby*, 328 U.S. 256, 265, and n.10 (1946) (physical invasions of airspace); cf. *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) (imposition of navigational servitude upon private marina).

*Id.* at 1015.

Appellees maintain the Court has repeatedly rejected governmental appropriation of money being subjected to the per se analysis. They rely, however, on cases where the government provided a service and charged a reasonable fee for that service. *See, e.g., United States v. Sperry Corp.*, 493 U.S. 52 (1989) (upholding imposition of reasonable fee for use of Iran-United States Claims Tribunal). As *Phillips* determined, the case at hand is not such a case:

> This would be a different case if the interest income generated by IOLTA accounts was transferred to the State *as payment for services rendered by the State*. Our holding does *not* prohibit a State from imposing reasonable fees it incurs in generating and allocating interest income. But here the State does not, indeed cannot, argue that its *confiscation* of [a client's] interest income amounts to a fee for services performed.

*Phillips*, 524 U.S. at 171 (emphasis added; internal quotation marks and citations omitted).  Moreover, the analysis in *Webb's* dispels any assertion that the per se test applies solely to governmental appropriation of real property.

Appellees also emphasize the district court's finding, 86 F. Supp. 2d at 643, that, absent the IOLTA program, net interest could not have been generated on Appellant Summers' funds.  But, as referenced earlier, the Court concluded in *Loretto*, 458 U.S. at 434-35, that a government's permanent physical occupation of property constitutes a per se taking, regardless of the economic impact on the owner.  Even more to the point, as stated in *Phillips*, 524 U.S. at 170:  "The government may not seize rents received by the owner of a building simply because it can prove that the costs incurred in collecting the rents exceed the amount collected".  Along this line, *Phillips* made clear that a client's rights to possess, control, and dispose of the interest earned on his funds are valuable rights, regardless of whether the interest has economic value.  *Id*.[6]

As our court has already noted for the case at hand, in order to prevail on their taking claim, Appellants must demonstrate the

_____

[6]The dissent at 7 maintains, erroneously, that we ignore the district court's factual findings.  Instead, we conclude, in the light of *Phillips* and *Loretto*, that they are not relevant. Pursuant to these cases, the economic impact on the owner is a non-factor in the takings analysis.  *See* note 10 *infra*.

14

taking was against the will of the property owner. ***Washington Legal Found.***, 94 F.3d at 1004.  Appellant Summers testified he objected to his interest being taken to support Texas' IOLTA program. However, he had no choice.  IOLTA programs are structured so that they satisfy Internal Revenue Service ruling 81-209, by which the IRS agrees not to tax clients on the interest generated by their funds in IOLTA accounts and paid to TEAJF if they have no control over whether to participate in the program.  *See* Rev. Rul. 81-209, 1981-2 C.B. 16; ***Phillips***, 524 U.S. at 162; ***Washington Legal Found.***, 94 F.3d at 1003.  Clients have no choice whether to participate because attorney participation in Texas' IOLTA program is mandatory. Therefore, a client cannot avoid the appropriation of his interest by selecting an attorney who elects *not* to participate.[7]

---

[7]Subsequent to oral argument, we directed the parties to file supplemental briefs on whether this case is resolved by ***Paulsen v. State Bar of Tex.***, ___ S.W.3d ___, 2001 WL 23180 (Tex. App. — Austin 11 Jan. 2001), *withdrawn on reh'g*, ___ S.W.3d ___, 2001 WL 300142 (Tex. App. — Austin 29 Mar. 2001), interpreting TEX. DISCIPLINARY RULES OF PROFESSIONAL CONDUCT, Art. 10, § 9, Rule 1.14(a); and TEAJF rules 21 and 22.  In ***Paulsen***, an attorney appealed the State Bar's refusal to grant him an exemption from IOLTA participation. In the course of rejecting that challenge, the Texas Court of Appeals, *in its original opinion*, stated:

> [T]hese rules permit lawyers to make full disclosure to clients regarding the use of IOLTA accounts and clients' property interest therein....  [L]awyers must invest client funds as directed by their clients.  If a client directs his lawyer to withdraw his funds from an IOLTA account, the lawyer should do so and inform the Bar that he takes such action at his client's insistence.  The IOLTA Rules provide that lawyers cannot be compelled

15

In reality, the linchpin for this case has already been inserted by the Supreme Court: "interest income generated by funds held in IOLTA accounts is the 'private property' of the owner of the principal" — the client. *Phillips*, 524 U.S. at 172.[8] And, because the State has permanently appropriated Appellant Summers' interest income against his will, instead of merely regulating its use, there is a per se taking. *Compare* *Loretto*, 458 U.S. at 432 & n.9, *with* *Penn Central*, 438 U.S. at 124.

It is well to remember that a "taking" is distinct from "just compensation".

> Once the fact of occupation is shown, ... a court should consider the *extent* of the

---

> to take any action in violation of the Disciplinary Rules. Because client funds are unquestionably client property, investing such funds in a manner contrary to a client's instructions would be a violation of the Disciplinary Rules and the lawyer's fiduciary duties.

*Id*. at ___, 2001 WL 23180, at *10. Obviously, the quoted language could be construed as interpreting the State Bar and TEAJF rules as making client participation in IOLTA *voluntary*, rather than *mandatory*.

In their supplemental briefs, the parties agreed, albeit for different reasons, that the original *Paulsen* opinion did *not* resolve the case at hand. In any event, subsequent to our requesting supplemental briefs, the opinion was revised to delete the above quoted language. *See* *Paulsen*, ___ S.W.3d at ___, 2001 WL 300142, at *10.

[8]Appellees request certifying to the Texas Supreme Court the question of whether a client has any property right in a Texas IOLTA account. *Phillips* has answered that question in the affirmative.

16

> occupation as one relevant factor in determining the compensation due. For that reason, ... there is less need to consider the extent of the occupation in determining whether there is a taking in the first instance.

*Loretto*, 458 U.S. at 437-38 (emphasis in original; footnote omitted). In other words, once a taking is found, the question becomes what amount of, not whether, just compensation is due. *Id.* at 441; *see also* **First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, Cal.**, 482 U.S. 304, 314 (1987) (Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power"); **Monongahela Navigation Co. v. United States**, 148 U.S. 312, 336 (1893) (government "can take only on payment of just compensation").[9] Again, as explained in **Phillips**, 524 U.S. at 170, there can be a compensable taking of a property right "even when infringement of that right arguably increase[s] the market value of the property at issue".[10]

---

[9]The dissent, thus, creates an anomaly by assuming at 7 there has been a "taking", yet concluding at 20 that, because there can be no "just compensation" for it, the taking is not unconstitutional. Contrary to the dissent's perception of the taking, in play is a "physical taking[] of tangible property", **Dissent** at 18.

[10]For the reasons given *supra*, that there has been a "taking" is not contingent on whether the client would have had "net interest" without the IOLTA program. Nevertheless, Appellants posit the following: deposits in demand accounts earn some interest, albeit at a low rate; the related costs are what preclude net interest; and it is the client's prerogative to incur those costs related to his earned interest on his principal even though, by doing so, it would probably result in a loss to the client.

17

B.

Originally, Appellants sought not only reimbursement of the earned interest, but also the following declaratory and injunctive relief: (1) declaring void rules requiring attorneys to place client-funds in IOLTA accounts; (2) enjoining TEAJF from both compiling lists of attorneys who fail to comply with IOLTA and transmitting those lists to the State Bar; and (3) enjoining the Justices of the Texas Supreme Court from (a) adopting any rules that purport to require attorneys, as a condition for practicing law in Texas, to handle client-funds in a manner designed to ensure that interest on those funds will accrue to anyone not designated by the client, and (b) taking disciplinary action against any attorney for failing to deposit client-funds in an IOLTA account.

But, as noted, our court has affirmed the district court's holding that the Eleventh Amendment bars Appellants' monetary-reimbursement claim. *Washington Legal Found.,* 94 F.3d at 1005. Therefore, Appellants now seek only prospective declaratory and injunctive relief.

---

Restated, Appellants urge that the earned interest must be segregated from the costs; that, notwithstanding those costs, the client has earned interest on his principal, and it is for him (his right) to decide how to use that interest. As stated, in the light of our foregoing analysis, it is not necessary to consider this contention.

1.

Following the remand by the Supreme Court, Appellees, for the first time, took the position that injunctive relief is not available, claiming:  the only remedy for an unconstitutional taking is just compensation; and Appellants should have sought it in state court.  Although Appellees maintain that position here, they do not strenuously urge it as a basis for affirmance.

The district court did not reach this issue.  Instead, it noted that, although Appellants were seeking only declaratory and injunctive relief, "they must still prove that a taking occurred 'without just compensation' in order to establish a violation of the Fifth Amendment, which is a prerequisite to relief".  ***Washington Legal Found.***, 86 F. Supp. 2d at 643 n.8.

a.

Perhaps the district court did not rule on this remedy issue because, in the prior appeal to our court, our court had stated:  "[Appellees] *concede* that they are *subject to* [Appellants'] prospective injunction claims".  ***Washington Legal Found.***, 94 F.3d at 1005 (emphasis added).[11]  Appellees are bound by that concession; they cannot now take an inconsistent position.  *See **Jett v. Zink***,

---

[11]The dissent at 2 - 6 posits erroneously that we hold Appellees conceded Appellants were "entitled" to equitable relief. Obviously, being "subject to" a claim is not the same as the party opposite being "entitled" to the corresponding requested relief. In any event, Appellees' concession in the prior appeal (that they were "subject to" Appellants' prospective injunction claims) is inconsistent with their position in this appeal that equitable relief is not available, that, instead, the only remedy for an unconstitutional taking is just compensation.

20

474 F.2d 149, 154-55 (5th Cir.) (party who argued on first appeal that action was *in personam* precluded from arguing on second appeal that action was *quasi in rem*), *cert. denied*, 414 U.S. 854 (1973). *Cf*. **United States v. Morris**, 79 F.3d 409, 411 (5th Cir. 1996) (in criminal case, refusing to allow Government to take position on appeal inconsistent with that in district court); **Gregory v. Missouri Pacific R.R. Co.**, 32 F.3d 160, 164-65 (5th Cir. 1994) (although "appellee generally may urge in support of a judgment any matter appearing in the record", it "cannot take one position before the district court and then take an inconsistent position" on appeal).

b.

In the alternative, Appellees' injunctive-and-declaratory-relief-unavailable-contention fails. Nevertheless, the contention has some support.

In **Duke Power Co. v. Carolina Environmental Study Group, Inc.**, 438 U.S. 59 (1978), individuals living near planned nuclear power facilities sought a declaration that the Price-Anderson Act, 42 U.S.C. § 2210, was unconstitutional. That Act imposed a limitation on liability for nuclear accidents resulting from the operation of private nuclear power plants licensed by the United States. Among other things, one claim was "in the event of a nuclear accident, their property would be 'taken' without any assurance of just compensation". *Id*. at 69. Then Justice Rehnquist, in his separate

21

opinion concurring in the judgment, maintained that the taking claim could be adjudicated only in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491 (granting jurisdiction to Court of Federal Claims to render judgment on claims against the United States founded on, *inter alia*, the Constitution). *Id.* at 101-02 & n.4 (Rehnquist, J., concurring). The majority held otherwise:

> Appellees are not seeking compensation for a taking, a claim properly brought in the Court of Claims, but are now requesting a declaratory judgment that *since the Price-Anderson Act does not provide advance assurance of adequate compensation in the event of a taking*, it is unconstitutional.... While the Declaratory Judgment Act does *not* expand our jurisdiction, it expands the scope of available remedies. Here it allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially *uncompensable* damages are sustained.

*Id*. at 71 n.15 (emphasis added).

Six years later, in ***Ruckelshaus v. Monsanto Co.***, 467 U.S. 986 (1984), the Court considered Monsanto's request for injunctive and declaratory relief, based on its claim that the data-disclosure and data-consideration provisions of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136, *et seq.*, effected a taking of its property (trade secrets) without just compensation. The Court stated: "Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation

22

can be brought against the sovereign subsequent to the taking". *Id.* at 1016 (footnote omitted). The Court held: because Congress, in FIFRA, had not expressly withdrawn jurisdiction under the Tucker Act, a Tucker Act remedy was available for any uncompensated taking. *Id*. at 1017-19. Accordingly, Monsanto's challenges to the constitutionality of FIFRA were held not ripe for resolution. *Id*. at 1019.

*Monsanto* did not overrule *Duke Power.* In fact, *Monsanto* cited *Duke Power* in support of the conclusion that Monsanto's claims were not ripe. *Id*. at 1021. *See also* *Preseault v. ICC*, 494 U.S. 1, 11 (1990) (taking claim against United States premature until property owner has availed itself of process provided by Tucker Act).

A year after *Monsanto* was decided, the Court applied its ripeness doctrine in a case in which the owner of property being developed as a residential subdivision claimed a county planning commission's application of zoning laws and regulations constituted a taking of its property. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985). The Court held that, because the property owner had "not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures [state law] provides for obtaining just compensation", its claim was "not ripe". *Id*. at 186.

The Court explained that the Fifth Amendment does not "require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking".  *Id*. at 194 (internal quotation marks omitted; citing **Monsanto**).  As is the case with taking claims against the United States, which are premature until the property owner has sought just compensation under the Tucker Act, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation".  *Id*. at 195.

Following **Monsanto**, the Ninth Circuit held that the "exclusive remedy" for a taking claim against the United States is "a suit for money damages under the Tucker Act"; therefore, neither declaratory nor injunctive relief is available.  **Clouser v. Espy**, 42 F.3d 1522, 1539 (9th Cir. 1994) (citing **Monsanto**), *cert. denied*, 515 U.S. 1141 (1995).  *See also* **Rose Acre Farms, Inc. v. Madigan**, 956 F.2d 670, 673-74 (7th Cir.) (reversing grant of injunctive relief against enforcement of federal regulation because of availability of just compensation under Tucker Act (citing **Monsanto** and **Presault**)), *cert. denied*, 506 U.S. 820 (1992).

Other circuits have held otherwise.  *See* **Student Loan Mktg. Ass'n v. Riley**, 104 F.3d 397, 402 (D.C. Cir.) (entertaining

24

declaratory relief request where alleged taking involved "straightforward mandate[] of cash payment to the government"), *cert. denied*, 522 U.S. 913 (1997); **LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.)**, 53 F.3d 478, 491-93 (2d Cir.) (distinguishing "statutes burdening real and tangible property" from "those [as in the case at hand] requiring direct transfers of money to the government", and holding: Tucker Act does not "remove from the federal district courts jurisdiction over an action for declaratory relief where no money damages have been requested"; **Duke Power** demonstrates "the clear availability of declaratory relief for asserted Takings Clause violations"), *cert. denied*, 516 U.S. 913 (1995); **Southeast Kan. Comty. Action Program, Inc. v. Secretary of Agric.,** 967 F.2d 1452, 1456-57 (10th Cir. 1992) (taking claim based on United States Department of Agriculture's failure to renew contract to administer federal child nutrition program; Tucker Act inapplicable when declaratory and injunctive relief sought).

More than a decade after **Monsanto** was decided, the Court in **Babbitt v. Youpee**, 519 U.S. 234, 242-43 (1997), affirmed declaratory and injunctive relief in an action challenging the constitutionality of a federal statute providing for escheat of fractional interests in land. Although at issue was whether there had been a taking, rather than the remedy that could be provided, **Babbitt** lends support to the conclusion that **Monsanto** and

25

*Williamson County* do not categorically prohibit such relief for taking claims, especially where, as here, the claim is not against the United States (thus, Tucker Act not in play).

In 1998, the Court considered a taking claim by a company no longer involved in the coal industry, challenging the constitutionality of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701-9722. *Eastern Enters. v. Apfel*, 524 U.S. 498 (1998). A four-Justice plurality concluded that the Act violated the Takings Clause, and that the challenged provisions should be enjoined as applied to Eastern. *Id*. at 538.

Citing *Monsanto*, the plurality acknowledged that "a claim [against the United States] for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute". *Id*. at 520. But, Eastern was not seeking compensation; instead, similar to the case at hand, it was requesting "a declaratory judgment that the Coal Act violates the Constitution and a corresponding injunction against the ... enforcement of the Act as to Eastern". *Id*. "Such equitable relief is arguably not within the jurisdiction of the Court of Federal Claims under the Tucker Act." *Id*.

The plurality noted the split among the Courts of Appeals regarding whether, for claims against the United States, equitable relief was available under the Takings Clause when just

compensation had not been sought under the Tucker Act. *Id*. at 520-21. Citing *Presault* and *Monsanto*, the plurality acknowledged that the "Court's precedent can be read to support the ... conclusion that regardless of the nature of relief sought, the availability of a Tucker Act remedy renders premature any takings claim in federal district court". *Id*. at 521. But, because the Coal Act mandated payments to a privately-operated fund, monetary relief against the United States was not an available remedy. *Id*. The plurality reasoned: "Congress could not have contemplated that the Treasury would compensate coal operators for their liability under the Act, for '[e]very dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation'". *Id*. (quoting *Chateaugay*, 53 F.3d at 493). "Accordingly, the 'presumption of Tucker Act availability must be reversed where the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds' mandated by the Government." *Id*. (quoting *Chateaugay*, 53 F.3d at 493). "In that situation, a claim for compensation 'would entail an utterly pointless set of activities.'" *Id*. (quoting *Riley*, 104 F.3d at 401).

The plurality stated *Duke Power* had "explained" that "the Declaratory Judgment Act allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained". *Id*. (internal quotation marks and citation

27

omitted).  And, it noted that, in analogous situations, the Court had "assumed the lack of a compensatory remedy ... for Takings Clause violations without discussing the applicability of the Tucker Act".  *Id*. at 521-22 (citing *Babbitt*, 519 U.S. at 243-45; *Hodel v. Irving*, 481 U.S. 704, 716-18 (1987)).  The plurality noted also that, without addressing the basis of its jurisdiction, the Court had "upheld similar statutory schemes against Takings Clause challenges".  *Id*. at 522 (citing *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 641-47 (1993); *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 221-28 (1986)).  Finally, the plurality stated that, although it was "'not bound by previous exercises of jurisdiction in cases in which [the Court's] power to act was not questioned but was passed *sub silentio*, neither should [it] disregard the implications of an exercise of judicial authority assumed to be proper' in previous cases".  *Id*. (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 307 (1962)).

Therefore, based on the nature of the alleged taking, which required Eastern to make payments to a privately operated fund for retirement benefits for former coal industry workers, the plurality concluded:  "the declaratory judgment and injunction sought by [Eastern] constitute an appropriate remedy under the circumstances, and ... it is within the district courts' power to award such equitable relief".  *Id*.

Needless to say, the challenged governmental action in the case at hand does not merely burden real or personal property; instead, it involves TEAJF's taking all of the interest earned on client-funds in IOLTA accounts. In that sense, it is more analogous to the challenged governmental actions in **Eastern Enterprises**, **Chateaugay**, and **Riley**, which involved payment of money to, or to support, a government program, than to the challenged governmental actions in **Monsanto** and **Williamson County**, which burdened real or personal property, and in which a procedure for seeking just compensation was available. Again, as **Chateaugay** explained, "where the challenged statute requires a person or entity to pay money to the government, it must be presumed that [the government] had no intention of providing compensation for the deprivation". **Chateaugay**, 53 F.3d at 493. "For such cases, use of the [just compensation] remedy would entail an utterly pointless set of activities, as '[e]very dollar paid pursuant to a statute would be presumed to generate a dollar of [just] compensation'". **Riley**, 104 F.3d at 401 (quoting **Chateaugay**, 53 F.3d at 493).

Restated, because the purpose of IOLTA is to take the interest generated from client-funds and use it to fund legal services for the indigent, it is obvious that the program makes no provision for payment of just compensation. If the interest earned on client-funds were available as just compensation for the clients, the very purpose of the program would be thwarted; therefore, it would defy logic, to say the least, to presume the availability of a just

29

compensation remedy. Because there is no "reasonable, certain and adequate provision for obtaining compensation ... at the time of the taking", *Williamson County*, 473 U.S. at 194, the ripeness doctrine does not preclude declaratory or injunctive relief.[12]

2.

Consistent with the conclusion by the district court, the Justices of the Texas Supreme Court claim they are legislatively immune from suit for injunctive relief. The district court's ruling was premised on its conclusion that the Justices do not possess the power to enforce compliance with the IOLTA program. *Washington Legal Found*., 86 F. Supp. 2d at 624.

a.

As discussed, the Justices, together with the other Appellees, conceded on the prior appeal to our court that they are subject to

---

[12]The dissent asserts at 12 that, by addressing ripeness, we have "buil[t] a straw man [and] then take[n] great pains to knock the stuffing out of him", because Appellees "have made no such argument in this appeal". But, as the dissent acknowledges, *id.*, Appellees do contend Appellants cannot claim injunctive relief because they have not availed themselves of available state remedies, citing, *inter alia*, *Williamson County*. The state remedies referenced by the dissent and Appellees are not "available". As the dissent acknowledges at 20, the Texas IOLTA program's provision for refunds is available only for a "client whose funds are wrongly placed in IOLTA accounts".

Nor, contrary to the dissent, do we rely on the ripeness doctrine to conclude that the claim for equitable relief is substantively viable. *Dissent* at 12. Instead, we hold the claim is substantively viable because there has been an unconstitutional taking of private property, and there is no mechanism for payment of just compensation.

30

Appellants' prospective injunction claims. ***Washington Legal Found.***, 94 F.3d at 1005. As also discussed, that concession is binding on them.

b.

In the alternative, and for the reasons that follow, we hold that, because the Texas Supreme Court has the power to suspend attorneys who do not comply with IOLTA rules, the Justices are not entitled to legislative immunity from this action.

Pursuant to its inherent power to regulate the practice of law in Texas, the Texas Supreme Court created the IOLTA program and its underlying rules. TEXAS RULES OF COURT - STATE, Rules Governing the State Bar of Texas Art. XI, § 2(D). Rule 24 addresses compliance with the IOLTA program: a Texas attorney is required to annually provide a written statement of compliance to TEAJF; if he fails to do so, TEAJF contacts him and attempts administratively to resolve the non-compliance; if unsuccessful, TEAJF places his name on a list of non-compliant attorneys and sends him a notice; if, within 30 days, the non-compliant attorney still refuses to file the required compliance statement, the State Bar of Texas notifies the Clerk of the Texas Supreme Court of such non-compliance; and the attorney "shall be" immediately suspended by the Clerk from the practice of law until the compliance statement is filed. *See* TEAJF rule 24; ***Washington Legal Found.***, 86 F. Supp. 2d at 622.

Applicable here is the holding in ***Supreme Court of Virginia v. Consumers Union of the United States, Inc.***, 446 U.S. 719, 725-26 (1980). There, a consumer organization brought an action against the Virginia Supreme Court and its chief justice for a declaration they had violated the First and Fourteenth Amendments by promulgating and enforcing rules prohibiting attorney advertising. The Supreme Court held the court and its chief justice, although legislatively immune from claims regarding the adoption of the challenged rules, were properly held liable in their enforcement capacities. *Id.* at 736.

### III.

For the foregoing reasons, we **REVERSE** and **REMAND** this case to the district court for entry, consistent with this opinion, of declaratory and injunctive relief.

*REVERSED and REMANDED*

ENDRECORD

32

WIENER, Circuit Judge, dissenting:


In Phillips v. Washington Legal Foundation,[13] the Supreme Court held that the plaintiffs in the instant case had a property right in the interest income from their funds deposited in IOLTA accounts. In dissent, Justice Souter criticized the majority's decision to determine that a property right existed in isolation from the questions (1) whether a "taking" had occurred, and (2) if so, what compensation, if any, might be owed. Justice Souter wrote that "if it should turn out that the 'just compensation' for any taking was zero, then there would be no practical consequence for purposes of the Fifth Amendment in recognizing a client's property right in the interest in the first place; any such recognition would be an inconsequential abstraction."[14]

After a full trial on remand, the plaintiffs in this case ("IOLTA II") have brought us to precisely the moment Justice Souter foretold by proving that their loss — and, therefore, the "just compensation" that they are due — is zero. By its literal terms, the Fifth Amendment can be violated only by governmental failure to pay just compensation: "The Fifth Amendment does not proscribe the

---

[13] 524 U.S. 156 (1998).

[14] Phillips, 524 U.S. at 174-75 (Souter, J., dissenting). Souter also compares the holding of Hooker v. Burr, 194 U.S. 415, 419 (1904) ("If a contractual obligation is impaired, but the obligor is 'not injured to the extent of a penny thereby, his abstract rights are unimportant.'").

taking of property; it proscribes taking without just compensation."[15] This constitutional truism convinces me that even if the Texas IOLTA program should involve the government's "taking" of "property," it would not violate the plaintiffs' constitutional rights because just compensation for zero is zero. I therefore respectfully dissent.

## I.

At the outset, I must take issue with the majority's assertion that the defendants-appellees[16] have conceded that the plaintiffs-appellants[17] are entitled to equitable relief: The defendants have done no such thing. In our previous decision in this case ("IOLTA I"), we stated — as a parting-shot discussion of Eleventh Amendment immunity — that "the defendants concede that they are

---

[15] Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194 (1985); see also Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 734 (1997) (noting that "only takings without 'just compensation' infringe th[e Fifth] Amendment"); First English Evangelical Lutheran Church of Glendale v. Los Angeles County, Cal., 482 U.S. 304, 315 (1987) (stating that the Fifth Amendment "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking").

[16] The Texas Equal Access to Justice Foundation, its chairman, and the Texas Supreme Court justices.

[17] The Washington Legal Foundation, attorney Michael J. Mazzone, and client William R. Summers.

34

**subject to** the plaintiffs' prospective injunction **claims.**"[18] We then concluded that the defendants were immune from a claim for monetary restitution.[19] There is a vast difference between conceding that the Eleventh Amendment is not a **bar** to the assertion of a **claim**, on the one hand, and conceding **entitlement** to the **relief sought** by asserting a claim, on the other.

I am sure that, as it states, the panel majority understands the distinction between a party being "subject to" a claim and the party opposite being "entitled to" equitable relief.[20] Yet, despite this voiced cognizance, the majority still concludes that the appellees somehow take a position here that is inconsistent with

---

[18] <u>Washington Legal Found. v. Texas Equal Access to Justice Found.</u>, 94 F.3d 996, 1005 (5th Cir. 1996) (emphasis added). In context, the entire paragraph reads thus:

> Finally, the district court also granted the defendants' request for immunity under the Eleventh Amendment with respect to the plaintiffs' claim for monetary restitution. The parties now only dispute whether the district court erred by declaring the defendants immune to the plaintiffs' restitution claim. The parties do not seriously challenge this portion of the district court's ruling; the defendants concede that they are subject to the plaintiffs' prospective injunction claims and the plaintiffs admit that their "principal concern all along has been in obtaining prospective injunctive relief." We suggest another reason for the parties' lackadaisical approach to this part of the decision: they realize that the district court is correct.

<u>Id.</u>

[19] <u>Id.</u>

[20] The majority at 20, n. 11.

their former concession by arguing on appeal that equitable relief is unavailable.  In doing so, the majority strains Judge Wisdom's simple jurisdictional statement in IOLTA I to the point of incredulity.  Consistent with a jurisdictional submission, appellees may still vigorously refute the availability of equitable relief for appellants on grounds unrelated to jurisdiction.  The appellees in their brief to this court in IOLTA II argue that equitable relief is not available to the appellants because (1) the appellants have failed to seek state administrative remedies and (2) compensation, not injunctive relief, is the only proper remedy for a 5th Amendment violation.  Neither of these contentions undermine a concession that appellees are subject to, ie., must address, the appellants' claims for injunctive relief.

Moreover, the majority's willingness to dispose of the issue based on its reading of the admission is premature.  Even assuming, arguendo, that appellees have taken an inconsistent position by reasserting an 11th Amendment claim on appeal, the inquiry cannot possibly end there.  At most, under the majority's reading, the appellees would have been holding an inconsistent position on the necessity to deal with the appellants' claims.  Determining the apparent inconsistency, for argument's sake, against the appellees only clears the initial jurisdictional hurdle; it does not, in any way, resolve the merits of the remedy issue.  Yet, the majority

36

decides both jurisdiction and the merits based on the concession, and, indeed, only resumes discussion of the merits of the prospective injunction claim "in the alternative." Hence, despite the majority's protestations to the contrary, it has effectively equated appellees' concession to hear and respond to appellants' remedy claims with a concession that appellees will not or even cannot contest those claims.

What the defendants-appellees actually wrote in their IOLTA I appellate brief is this: "Appellees concede that the Eleventh Amendment is not a jurisdictional bar to the claims asserted by Appellants for prospective injunctive relief against Appellee Newton[21] as a state official." At another point in their brief, the defendants wrote:

> The Texas IOLTA Program Appellees concede that the Eleventh Amendment is <u>not a jurisdictional bar</u> to Appellants' claims. Rather, the Texas IOLTA Program Appellees contend <u>that they are entitled to Eleventh Amendment immunity from</u> Appellants' claims for damages, including restitution, and <u>any other claim than a claim for prospective injunctive relief</u>.[22]

---

[21] Defendant W. Frank Newton, then-chairman of the Texas Equal Access to Justice Foundation.

[22] Emphasis added. Similarly, defendants-appellees the Texas Supreme Court justices wrote in their 1995 brief to this court in

37

Thus, the defendants successfully asserted Eleventh Amendment immunity from monetary damages while acknowledging nothing more than that the Eleventh Amendment does not bar governmental defendants from having to defend claims of prospective relief on the merits.

This is no quibble on my part: A concession that something is not a bar to a claim is a far cry from a concession that a plaintiff is entitled to relief. As the defendants have vigorously contested the plaintiffs' claims both times that they have come before this court, I must protest the majority's attempts to portray the defendants as having conceded the issue of the plaintiffs' entitlement to equitable relief.

## II.

The Takings Clause of the Fifth Amendment reads, in pertinent part: "nor shall private property be taken for public use, without just compensation."[23] To prove a violation of the Takings Clause, a plaintiff must prove that (1) property (2) has been taken for public use (3) without just compensation.

---

IOLTA I: "Even assuming that some violation of the Constitution could be established, however, the relief available to plaintiffs is limited to prospective injunctive relief only." (emphasis added). I will not address the justices' claim of legislative immunity because I discern no constitutional violation.

[23] U.S. Const. amend. V.

The Supreme Court held in <u>Phillips</u> that the plaintiffs have a property right in the interest income on their IOLTA accounts, satisfying part one of the three-part inquiry. And I am willing to concede for purposes of this dissent (even though I would have resolved the issues differently) that a "taking" occurred in this case, satisfying part two.[24] Although this puts the plaintiffs two-thirds of the way home, that is as far as they get —— legitimately, at least. Because the Fifth Amendment does not forbid the government from (1) taking (2) property, but requires only that, when property is taken, "just compensation" be paid, "the crux of this case rests on the issue of just compensation."[25] And, clearly, "just compensation" is payment of value for equal value.[26] None can argue that the equal value of zero is anything other than zero —— at least not forthrightly.

The majority discourses on the nature of takings remedies in the abstract, but chooses to ignore the specific factual findings made by the district court in its detailed opinion in this case. That court conducted a two-day bench trial, during which it considered evidence that the plaintiffs presented regarding three

<hr />

[24]   As the majority points out, there is no dispute that any taking in this case was "for public use."

[25]   <u>Washington Legal Found. v. Texas Equal Access to Justice Found.</u>, 86 F. Supp. 2d 624, 637 (W.D. Tex. 2000).

[26]   <u>See</u> <u>United States v. Reynolds</u>, 397 U.S. 14, 16 (1970).

separate accounting approaches to handling client funds — in-firm pooling, sub-accounting,[27] and the net benefit theory. Weighing all the evidence presented, the court concluded that the only plaintiff with funds in a Texas IOLTA account, William R. Summers, suffered no loss — zero. Indeed, Mr. Summers himself testified candidly and unequivocally to that fact.

Solidly grounded in trial testimony, the court found that the plaintiffs proved no loss under any of the three accounting approaches that they proffered: (1) Mr. Summers's funds could not earn net interest if placed in a non-IOLTA pooled account with funds of a law firm's other clients; (2) the plaintiffs did not establish that their funds could earn net interest in a sub-account, given the costs associated with such accounts; and (3) the plaintiffs failed to prove that they could gain a "net benefit" from their funds even if they could not earn net interest on them. The court concluded soundly that the plaintiffs did not satisfy their burden of proof:

> Plaintiffs failed to establish an actual number denominating Mr. Summers' loss. With regard to this case and Mr. Summers' monies, Plaintiffs have failed to carry

---

[27] Sub-accounting is a banking product that allows a law firm to open a master account and link a sub-account for each client. Although apparently not now available in Texas, a firm theoretically could open a sub-account using an out-of-state bank.

their burden of proof. Although this case turns on endless abstractions and near impossible mathematical conclusions it is without doubt that at a minimum Plaintiffs must present evidence to this Court that Mr. Summers is materially worse off because of IOLTA. At trial Mr. Summers testified that he is no worse off because of IOLTA.[28]

The plaintiffs insist that the district court's factual conclusions contain errors, most notably the court's failure to acknowledge that the rules determining whether client funds are to be placed into IOLTA accounts require attorneys to consider the administrative costs of opening and maintaining non-IOLTA accounts, but not IOLTA accounts.[29] When these costs are factored in, argue

---

[28] Washington Legal Found., 86 F. Supp. 2d at 643; see also Marion & Rye Valley Ry. Co. v. United States, 270 U.S. 280, 282 (1926) (affirming denial of a compensation claim and stating that even if a taking technically occurred, "[n]othing was recoverable as just compensation, because nothing of value was taken from the company, and it was not subjected by the government to pecuniary loss").

[29] Texas attorneys may place client funds in IOLTA accounts only if:

> such funds, could not reasonably be expected to earn interest for the client or if the interest which might be earned on such funds is not likely to be sufficient to offset the cost of establishing and maintaining the account, service charges, accounting costs and tax reporting costs which would be incurred in attempting to obtain the interest on such funds for the client.

41

the plaintiffs, clients could realize a <u>net benefit</u>, i.e., a smaller gap between interest earned and the lawyers' costs (ultimately passed along to the clients) of maintaining the account even though clients can never realize <u>net interest</u>.

The plaintiffs are just plain wrong.  The record confirms that the district court specifically considered evidence on this issue and rejected the claim.[30]  The court's conclusion jibes with its finding that the costs of administering the money placed in a non-IOLTA account exceed those in an IOLTA account.[31]  The plaintiffs' other allegations of factual error are equally feckless.

At no point do the plaintiffs ground their theoretical arguments in an assertion of any specific monetary loss suffered by Mr. Summers — indeed, they could not.  This failure absolutely precludes their ability to demonstrate clear error in the district

---

Tex. R. Equal Access Rule 6.

[30] <u>Washington Legal Found.</u>, 86 F. Supp. 2d at 638 ("Plaintiffs argue that client funds can generate a net benefit to the client when not placed in IOLTA.  The Court finds that the testimony at trial established otherwise.  There are innate costs to the firm or lawyer in a non-IOLTA account that differ from those in an IOLTA account.").

[31] <u>Id.</u> at 646.  The defendants attribute this fact to lower in-firm administrative costs for IOLTA accounts and the fact that bank fees on those accounts typically are paid by IOLTA or waived by banks.

court's factual finding that Mr. Summers's loss was "zero."[32] The Supreme Court defines "just compensation" for a taking as "the full monetary equivalent of the property taken."[33] Payment of just compensation is an effort to put the claimant, from his own viewpoint, "'in as good a position pecuniarily as if his property had not been taken.'"[34] It follows inescapably that when the owner's loss is zero, he is owed no compensation.[35]

Unable to prove any monetary loss whatsoever, the plaintiffs have abandoned their claim for monetary restitution.[36] Instead they

---

[32] Id. at 643. The court's factual findings and inferences are reviewed for clear error. Fed. R. Civ. P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985); Robicheaux v. Radcliff Material, Inc., 697 F.2d 662, 666 (5th Cir. 1983).

[33] Reynolds, 397 U.S. at 16; see also Kimball Laundry Co. v. United States, 338 U.S. 1, 5 (1949) (disregarding subjective value as a measure of compensation: "In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power is properly treated as part of the burden of common citizenship.").

[34] United States v. 564.54 Acres Land, 441 U.S. 506, 510 (1979) (quoting Olson v. United States, 292 U.S. 246, 255 (1934)); see also Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195 (1910).

[35] The finding of zero compensation due distinguishes this case from a similar challenge currently on en banc rehearing by the Ninth Circuit. The Ninth Circuit panel opinion, now vacated, would have remanded that case to the trial court to determine what compensation was owed. Washington Legal Found. v. Legal Found. of Washington, 236 F.3d 1097, vacated, 248 F.3d 1201 (9th Cir. 2001).

[36] We have held that the Eleventh Amendment bars the plaintiffs' monetary reimbursement claim. IOLTA I, 94 F.3d at 1005.

43

seek only declaratory and injunctive relief against the Texas IOLTA program.  Yet these equitable remedies, standing alone, are obviously inappropriate to the situation at hand, in which the absence of economic loss and the concomitant absence of compensation due proves that there has been no Fifth Amendment violation at all.

We need not pause to ponder whether freestanding equitable relief can <u>ever</u> be an appropriate remedy for an unconstitutional taking, for <u>in this case</u> there is no unconstitutional (i.e., uncompensated) taking.  This immutable fact eschews any justification for legal or equitable remedy whatsoever.  The plaintiffs are absolutely wrong to argue —— and the panel majority to accept —— that their "entitlement to just compensation is of limited relevance to this appeal."  To the contrary, such entitlement —— or the absence thereof —— lies at the very heart of this appeal.  As the plaintiffs have not been denied just compensation, they could not prove —— and have not proved —— any violation of their constitutional rights.

### III.

The panel majority nevertheless strains to justify its award of prospective equitable remedies here by implying that the <u>ripeness</u> doctrine —— of all things —— does not preclude them.  But not precluding a remedy is far different from justifying a remedy.

44

On its path to injunctive relief, the majority first builds a straw man then takes great pains to knock the stuffing out of him, based on the defendants' apparent argument at an earlier stage of this case that the plaintiffs should have sued for compensation in state court. The defendants have made no such argument in this appeal, IOLTA II, a fact that the plaintiffs themselves now call to our attention. Rather, the defendants address ripeness only to make the valid point that plaintiff Summers has failed to seek and exhaust the available administrative remedy of a refund of any interest due to him under the IOLTA rules. The district court did not reach this issue, and I am willing to concede it for the purposes of this dissent, accepting the plaintiffs' assertions that they were unaware of the refund policy until 1998 and that a state suit would be futile. The outcome of this case does not turn, however, on any issue of ripeness.[37] The mere fact that this claim may be ripe does not mean that it is substantively viable, and it certainly does not justify the award of equitable remedies here.

The cases relied on by the majority to address the (nonexistent) ripeness issue are easily distinguishable. <u>Eastern</u>

---

[37] <u>See</u> <u>Texas v. United States</u>, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (internal quotations omitted).

45

Enterprises v. Apfel,[38] LTV Steel Co. v. Shalala (In re Chateaugay Corp.),[39] and Student Loan Marketing Association v. Riley[40] all analyze the threshold jurisdictional question of whether a federal court has the power to award equitable relief for a taking that involves a direct transfer of a determinable sum of money to the federal government, relieving the plaintiffs of the need first to sue for compensation in the Court of Federal Claims under the Tucker Act.[41]  In each of these three cases, which involve alleged regulatory takings with a quantifiable economic impact on the plaintiffs, the court found that a suit for money damages would be pointless because the claimed (in two of the three cases, failed claim of a) taking would have necessitated a dollar-for-dollar monetary reimbursement.  Unlike the instant case, these cases did not involve plaintiffs whose monetary compensation claim was pointless because they had gone to trial and lost, having suffered

---

[38]  524 U.S. 498 (1998).

[39]  53 F.3d 478, 492 (2d Cir. 1995) (rejecting claim that Coal Act resulted in unconstitutional taking after noting that "the question of jurisdiction in this case masks a broader question of ripeness:  Can a takings claim ever be brought in a district court without first seeking compensation in the Court of Federal Claims?").

[40]  104 F.3d 397 (D.C. Cir. 1997) (rejecting claim that 0.3 percent "offset fee" on principal amount of each student loan held by the Student Loan Marketing Association ("Sallie Mae") imposed an unconstitutional taking).

[41]  28 U.S.C. § 1491.

**no monetary loss.** The Declaratory Judgment Act may offer one remedy for an unconstitutional taking, that is, an uncompensated taking; it is no <u>substitute</u>, however, for proof of loss.[42]

Another case relied on by the majority, <u>Southeast Kansas Community Action Program Inc. v. Secretary of Agriculture</u>,[43] implicated a due process claim — <u>not a takings case at all</u> — in which the plaintiffs' primary purpose in bringing suit was to receive the classic due process remedy: a hearing. Finally, in <u>Babbitt v. Youpee</u>,[44] the Court approbated equitable relief in a situation in which the statute in question already had been found to take interests in other lands valued at $100, $1,816, and $2,700, with no possibility of compensation.[45] In <u>Youpee</u>, those taken property interests were worth $1,239 — not "zero." Once the Supreme Court determined that an amendment to the statute aimed at curing that defect still did not rectify the uncompensated taking,

---

[42] I note further that two of these three cases apply the ad hoc takings analysis of <u>Penn Central Transportation Co. v. City of New York</u>, 438 U.S. 104, 124 (1978), and <u>Kaiser Aetna v. United States</u>, 444 U.S. 164, 175 (1979), which the majority rejects in favor of a <u>per se</u> analysis. <u>See</u> <u>Eastern Enters.</u>, 524 U.S. at 523-24; <u>Chateaugay</u>, 53 F.3d at 494. The third case found that a regulatory action was not a taking at all because the burden was "'a fair approximation of the costs of benefits supplied.'" <u>Riley</u>, 104 F.3d at 402 (quoting <u>United States v. Sperry Corp.</u>, 493 U.S. 52, 60 (1989)).

[43] 967 F.2d 1452 (10th Cir. 1992).

[44] 519 U.S. 234 (1997).

[45] <u>Hodel v. Irving</u>, 481 U.S. 704 (1987).

it sanctioned equitable relief against enforcement of the statute, just as it had upheld the award of appropriate relief before the unconstitutional provision was amended.  In affirming the Ninth Circuit, the Supreme Court quoted that circuit court's suggestion that, although the government could not constitutionally apply the statutory scheme, it could obtain the interests by other means, such as purchasing the land in question or condemning it and paying just compensation to the plaintiffs.[46]

The panel majority seeks to rely on these cases by analogy to justify an award of equitable relief alone, but they simply are not analogs to this case.  The reasoning in that line of cases cannot be stretched far enough to cover the facts at hand; yet the plaintiffs, having themselves proved that they have not been denied just compensation, nonetheless ask us to impose a prior restraint on a program that has found favor in all fifty states.[47]  That the plaintiffs —— and others —— may (and obviously do) oppose on ideological grounds a state program funded with IOLTA interest does

---

[46]  Youpee, 519 U.S. at 242 (citing Youpee v. Babbitt, 67 F.3d 194, 200 (9th Cir. 1995)).  Irving and Youpee involved attempts to reduce highly fractionated interests in Indian-owned lands.

[47]  Every state, plus the District of Columbia and the Virgin Islands, operates an IOLTA program.

not vest us with the judicial right to meddle with that plan, which itself does not violate the U.S. Constitution.[48]

And make no mistake about it:  We are not here contemplating some threatened taking that the mandatory Texas IOLTA program, which became effective in 1989, might inflict on some as-yet unidentified plaintiff, or on these specific plaintiffs at some future date.  This case is about these plaintiffs, here and now. Funds owned by Mr. Summers —— a $1000 retainer Mr. Summers paid to Mr. Mazzone in 1993, and a $250 retainer he paid in 1999 —— have been held in IOLTA accounts since 1993, prior to the commencement of this litigation and throughout its pendency as well.  The plaintiffs now have had a full trial, during which they failed to carry their burden of proving that they are due any just compensation whatsoever.  They have not shown clear error in the district court's conclusion that they are due no compensation at all, or a legal basis for awarding prospective relief.  And because it cannot, the panel majority has not identified any specific amount that the plaintiffs have not been compensated; neither has

---

[48]  See Donald L. Beschle, The Supreme Court's IOLTA Decision: Of Dogs, Mangers, and the Ghost of Mrs. Frothingham, 30 Seton Hall L. Rev. 846, 867 (2000) ("In Phillips, what is being 'taken' is the right to exclude in its purest form —— that is, the psychological satisfaction of denying a benefit to another.  This is the legal equivalent of the legendary 'dog in the manger,' a metaphor in which a dog aggressively prevents other animals from access to something —— hay in the manger —— that is of no practical use to the dog itself.").

the majority demonstrated any valid support for decreeing injunctive or declaratory relief under these facts. To me, it is just that plain.

IV.

To recap, the Takings Clause "was not meant to prevent the government from pursuing legitimate goals; it was meant only to assure that no individual would be unduly burdened in the process of doing so."[49]  The Texas IOLTA program, which generates approximately $5 million a year in total revenues from attorney trust funds — nominal and short-term deposits from individual clients as well as monies from for-profit corporations and partnerships — does not implicate the classic takings problem of fairness, in which an individual or small group is singled out to bear burdens that should be borne by the public as a whole.[50] Neither does it offend the original purpose of the Takings Clause, which was narrowly crafted to require compensation only for physical takings of tangible property by the federal government.[51]

---

[49]  Id. at 892.

[50] See Penn Central, 438 U.S. at 123-24.  The plaintiffs argue that "virtually all client funds" held by attorneys end up in IOLTA accounts, spreading the "burden" of funding legal services for the poor among many users of the court system, not a small group.

[51]  See, e.g., William Michael Treanor, The Original Understanding of the Takings Clause and the Political Process, 95 Columbia L. Rev. 782, 859-60 (1995) ("[T]he federal Takings Clause and its predecessor clauses, as they were originally understood, divided governmental actions affecting property into two groups.

The clause was never intended to usurp the role of the people in deciding what social programs are appropriate, and "has not been understood to be a substantive or absolute limit on the government's power to act. The Clause operates as a conditional limitation, permitting the government to do what it wants so long as it pays the charge."[52]

It is important to remember that we cannot substitute concerns about due process — addressing the legitimacy and purpose of Texas's operation of its IOLTA program, which I perceive to be the plaintiffs' real complaint in this case — for concern about a taking, which turns on the availability of just compensation.[53] Our role is strictly limited to ensuring that initiatives such as the Texas IOLTA program provide a mechanism for providing "just

---

When the government physically took property, it owed compensation. Any other governmental action, no matter how severely it affected the value of property, did not give rise to a compensation requirement. This requirement applied to physical takings because the framers believed that majoritarian decisionmaking processes would not give fair consideration to the individual's interest in not having her property physically seized by the government.

"The clause sought to remedy failures in the political process. But the underlying idea was not that all majoritarian decisions should be reviewed to determine whether the process behind any particular decision was fair or unfair. Rather, heightened constitutional protection was provided only for the limited category of decisions in which unfairness was most likely.").

[52] See Eastern Enters., 524 U.S. at 545 (Kennedy, J., concurring in the judgment and dissenting in part).

[53] See id.

compensation" for any taken property.[54]  The Texas IOLTA program has just such a mechanism, a provision for refunding any interest that could have been earned by a client whose funds are wrongly placed in IOLTA accounts.  And, the state routinely grants requests for such refunds.

The plaintiffs in this case have had their day in court, and have themselves proved that they have not been denied "just compensation" for any purported governmental taking of property that they may have experienced from the enforcement of the Texas IOLTA program.  No deprivation of just compensation means no possibility of a constitutional violation.  As I would in all respects affirm the judgment of the district court, I respectfully dissent.[55]

----

[54] See Williamson County, 473 U.S. at 194 (explaining that the Fifth Amendment requires the government to "provide[] an adequate process for obtaining compensation").

[55] Because the majority did not address the plaintiff's claimed First Amendment violation, I do not, either.  I merely note in passing that the argument will fall of its own weight.