# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 00-50139
_____

WASHINGTON LEGAL FOUNDATION, WILLIAM R. SUMMERS,
and MICHAEL J. MAZZONE,

Plaintiffs-Appellants,

versus

TEXAS EQUAL ACCESS TO JUSTICE FOUNDATION, RICHARD TATE, Chairman,
Texas Equal Access to Justice Foundation, THOMAS R. PHILLIPS, Chief
Justice, and Justices NATHAN R. HECHT, CRAIG T. ENOCH, PRISCILLA R.
OWENS, JAMES A. BAKER, DEBORAH G. HANKINSON, HARRIET O'NEILL, and
XAVIER RODRIGUEZ in their official capacities as Justices of the
Supreme Court of Texas,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas, Austin Division
_____

May 31, 2002

ON PETITION FOR REHEARING EN BANC
(Opinion October 19, 2001, 5 Cir., 2001 270 F.3d 180)

Before WIENER, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

Treating the Petition for Rehearing En Banc as a Petition for
Panel Rehearing, the Petition for Panel Rehearing is DENIED. The
court having been polled at the request of one of the members of
the court and a majority of the judges who are in regular active
service not having voted in favor (Fed. R. App. P. and 5th Cir. R.
35), the Petition for Rehearing En Banc is DENIED.

Judge Higginbotham did not participate.

CHIEF JUDGE KING and JUDGES JOLLY, WIENER, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges, dissenting from denial of rehearing en banc.[1]

In this second round of the captioned case, a divided panel of our court reversed the district court's ruling and held the Texas Interest on Lawyers' Trust Accounts (IOLTA) program unconstitutional. Soon afterwards, the Ninth Circuit, sitting en banc, upheld the constitutionality of an essentially identical IOLTA program in the State of Washington.[2] In so doing, the court formulated answers to constitutional questions that are common to both cases, answers that are consistent with those in our district court's ruling and Judge Wiener's panel dissent, and thus contrary to those of our panel majority. Despite this split in the circuits, our 2-1 reversal of the district court, and the far-reaching, exceptionally important constitutional and practical consequences of the Fifth Amendment jurisprudence thus established for this circuit by but two of our judges, a tie among voting active judges prevented this case from receiving the rehearing en banc that it so richly deserves. Given (1) the disagreement

---

[1] Judge Higginbotham recused himself from the case, leaving fourteen active Circuit Judges, seven of whom voted for en banc rehearing and seven of whom voted against it. Pursuant to Fifth Circuit operating procedure, an evenly divided vote on an en banc poll results in denial of rehearing en banc, leaving the panel opinion in effect.

[2] Washington Legal Foundation v. Legal Foundation of Washington, 271 F.3d 835 (9th Cir. 2001) (holding that, although interest in IOLTA accounts is property, no taking occurred and no just compensation was due).

between our panel majority and the Ninth Circuit sitting en banc, (2) the fact that our panel majority opinion forges novel and far-reaching Takings jurisprudence for this circuit, (3) the inability of the plaintiffs to show any compensable loss whatsoever, and (4) the effect on IOLTA programs that will likely result from the opinion of the panel majority, we find it difficult to understand how any judge of this court (even those who served on this panel) could fail to deem this case worthy of en banc reconsideration, irrespective of what the reasoning and result should be. We are therefore constrained to dissent respectfully from this denial of a rehearing en banc. Our hope is that the Supreme Court will see fit to address this very important case once again and resolve the questions left unanswered by its prior opinion.[3]

_____

[3] Phillips v. Washington Legal Foundation, 524 U.S. 156, 172 (Rehnquist, C.J.):

> We express no view as to whether these funds have been "taken" by the State; nor do we express an opinion as to the amount of "just compensation," if any, due respondents. We leave these issues to be addressed on remand.

WIENER, Circuit Judge, supplementing the foregoing dissent from denial of rehearing en banc:[****]

My reasons for believing that this case is worthy of en banc review are the same as those set forth in the foregoing dissent by the seven of us who voted to rehear it. I now write separately to add the substantive law reasons why I am convinced that we should have reheard this appeal en banc and reinstated the judgment of the district court.

As a practical outcome for our circuit, the panel majority's holding dismantles IOLTA programs that have found favor in all fifty states as a means of funding legal services for the underprivileged while fulfilling lawyers' ethical obligations to contribute to the delivery of such services for that segment of society.[1] Jurisprudentially, the opinion of the panel majority forges novel Fifth Amendment Takings jurisprudence for our circuit by mandating a simple analytical approach ⸺ and its scope ⸺ that must be taken when courts of this circuit consider a Takings Clause issue. I shall do my best to demonstrate why I believe that the panel majority's reasoning and judgment are wrong.

## I. IOLTA I

Following our first go-around with Washington Legal Foundation

---

[****] Chief Judge King and Judges Benavides, Stewart, Parker, and Dennis join in this supplemental dissent.

[1] Phillips v. Washington Legal Foundation, 524 U.S. 156, 159 n.1 (1998); Model Rules of Professional Conduct Rule 6.1; State Bar of Tex. Pro Bono Policy; Geoffrey C. Hazard, Jr., After Professional Virtue, 6 Sup. Ct. Rev. 213, 215 (1989).

v. Texas Equal Access to Justice,[2] a five-justice majority of the Supreme Court deliberately answered but one of three questions raised by the case. That majority held that interest on funds deposited into lawyers' trust accounts is "property" of the client, but the same majority expressly left unanswered the other two questions:

> We express no view as to whether these funds have been "taken" by the State; nor do we express an opinion as to the amount of "just compensation," if any, due respondents. We leave these issues to be addressed on remand.[3]

The Court neither stated nor implied that prospective (injunctive) relief is even a possibility. Pursuant to the Supreme Court's directive and the crucial, far-reaching impact of the answers to these constitutional questions, this case and its implications at the circuit level of the fifty sovereign states should not have been left to the determination of but two (or even three if the panel had been unanimous) of our fifteen active judges.

Our panel majority's opinion and the Ninth Circuit's en banc opinion validate Justice Souter's worst concerns and predictions in

---

[2] Washington Legal Foundation v. Texas Equal Access to Justice (IOLTA I), 873 F. Supp. 1 (W.D. Tex. 1995) aff'd in part, vacated in part, rev'd in part by 94 F.3d 996 (5th Cir. 1996) r'hrg en banc denied by 106 F.3d 640 (5th Cir. 1997) cert. granted in part by Phillips v. Washington Legal Foundation (Phillips), 521 U.S. 1117 (1997) aff'd by 524 U.S. 156 (1998) appeal after remand by 86 F. Supp. 2d 624 (W.D. Tex. 2000) (IOLTA II) rev'd and remanded by 270 F.3d 180 (2001) (Wiener, J. dissenting).

[3] Phillips, 524 U.S. at 172 (Rehnquist, C.J.) (emphasis added).

5

<u>Phillips</u>.[4]  In the eyes of the dissenting justices, the majority's recognition of the plaintiff's "abstract property right to interest 'actually earned'"[5] on his principal — severed from the inextricable questions whether a taking occurred and, if so, whether compensation is due — skewed the Fifth Amendment analysis.[6]  Indeed, just as Justice Souter predicted, our district court's determination that the plaintiffs could not prove any amount of monetary loss under any accounting or economic theory demonstrates that the Supreme Court's abstract pronouncement in <u>Phillips</u> identified a right that exists in theory but is moribund in reality:  With zero compensable loss, the abstract property right recognized by the Court has "no practical consequences for purposes of the Fifth Amendment."[7]

## II.  <u>IOLTA II</u>

### A. <u>Takings:  Ad Hoc versus Per Se Analysis</u>

A divided panel of this court has now established the Takings jurisprudence for this circuit regarding whether to use ad hoc or

---

[4]  <u>Phillips</u>, 524 U.S. at 175-76, 178 (Souter, J., joined by Stevens, Ginsburg, and Breyer JJ., dissenting).

[5]  <u>Id.</u> at 178.

[6]  <u>Id.</u> ("One may wonder here not only whether the theoretical property analysis may skew the resolution of the taking and compensation issues that will follow, but also how far today's holding may unsettle accepted governmental practice elsewhere.")

[7]  <u>Id.</u> at 174.

per se analysis when the property purportedly "taken" is money ——
more specifically, the illusory right to future interest, if any ——
that is both fungible and valued in dollars on its face.
Consequently, determination whether the workings of IOLTA effect a
taking depends largely on the analytical methodology employed by
the examining court.  The Ninth Circuit noted that, in Takings
Clause cases, one or the other of two analyses —— ad hoc or per se
—— has been employed.[8]  Explaining that the per se analysis
generally has not been used except in the context of real property,
the Ninth Circuit determined that the ad hoc takings analysis is
the correct method to apply when the property at issue is the mere
intangible personal property right to <u>potential</u> interest, such as
that which might accrue in IOLTA accounts.[9]  In then conducting its
ad hoc assessment, the Ninth Circuit inspected (1) the economic
impact of the regulation on the claimant, (2) the extent to which
the regulation interfered with investment-backed expectations, and
(3) the character of the governmental action.[10]  Based on the

---

[8]  <u>Id.</u> at 854 (citing <u>Loretto v. Teleprompter Manhattan CATV Corp.</u>, 458 U.S. 419 (1982) (use of per se analysis); <u>Penn Central Transportation Co. v. City of New York</u>, 438 U.S. 104 (1978) (use of ad hoc analysis)).

[9]  <u>Id.</u> at 856-57:
Although we note that the Fifth Circuit recently has decided in a two to one decision to adopt the per se method of analysis in similar (but not identical) circumstances, <u>given the monetary nature of the property in question, the public nature of the IOLTA program, and the highly-regulated nature of the banking industry, we believe the better approach is [the ad hoc analysis] of Penn Central.</u> (emphasis added) (citations omitted).

[10]  <u>Id.</u> at 857

unassailable truism that, absent the IOLTA program, the plaintiffs could not have recognized <u>any</u> net interest on their principal and that their investment position was no worse-off with IOLTA in place than without it, the court's ad hoc calculus revealed that no "taking" under the Fifth Amendment had occurred.[11]

Our analysis should have been guided by an understanding of the exact nature of the "property" at issue, not merely that, according to the Supreme Court, it is property. Here, we deal with neither tangible or intangible real property, nor even tangible personal property, such as a painting taken by a city for display in the Hotel de Ville. Rather, the "property" here at issue is the ephemeral net interest, if any, on a client's funds deposited into an IOLTA account, which can only produce net interest when combined with funds of other clients: Separately, the deposited funds are too few or are held too briefly to produce net interest for the individual client who owns the principal on deposit.

The only answer provided by the Supreme Court in <u>Phillips</u> is that this potential interest to be earned on funds in an IOLTA account is property. Post <u>Phillips</u>, the first question we must answer —— whether to apply ad hoc or per se analysis, or some yet unarticulated method to be used in situations when money is the purportedly taken property —— is a novel and open one for our circuit, not to mention the entire federal system, save only the

---

[11] In my panel dissent I assumed <u>arguendo</u> that a taking had occurred so as to reach the position that, even if there is a taking, it is unconstitutional <u>only</u> if done without just compensation.

8

Ninth Circuit. Our panel majority's opinion assumes that the appropriation of IOLTA funds is a physical intrusion of property requiring application of the per se test articulated in Loretto v. Teleprompter Manhattan CATV Corp.[12] Like many of the cases employing per se analysis, however, Loretto involved only real property, making its application to the instant case a very questionable proposition. Whether appropriation of interest on an IOLTA account should be analyzed identically to physical invasions of real or tangible personal property is particularly important in light of the Supreme Court's recent directive:

> This longstanding distinction between acquisitions of property for public use, on the one had, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as a controlling precedents for the evaluation of a claim that there has been a "regulatory taking," and vice versa.[13]

The key inquiry thus becomes whether appropriation of IOLTA funds is akin to the physical intrusion discussed in other per se cases. Scrutiny of (1) the original "fairness and justice" purposes of the Fifth Amendment, (2) the rationale underlying the per se doctrine, (3) the methodology employed by takings cases involving money or monetary liability, in addition to (4) a thorough evaluation of the cases purportedly supporting application

---

[12] 458 U.S. 419 (1982) (holding that a takings had occurred by the fact of the physical intrusion of a cable company's cable on the roof of a privately owned building).

[13] Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. ___, ___, 122 S.Ct. 1465, 1479 (2002) (citation omitted).

of the per se doctrine, makes clear that this doctrine, as it is used in cases dealing with real or tangible personal property, is ill-suited to analyze the instant case, which involves intangible personal property in the form of potential interest on principal.

B. **Fairness and Justice**

The original purpose of the Fifth Amendment reflects an understanding that situations like the one presented by IOLTA do not fall neatly into any particular takings analysis. One of the Supreme Court's venerable Takings Clause cases, United States v. Armstrong, teaches that "The Fifth Amendment's guarantee that private property shall not be taken for public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole."[14] Here, no one, including the plaintiffs, is being asked to "bear" a public burden in any sense that impinges on the notions of fairness and justice. In fact, the evidence presented in the district court clarifies that absolutely no hardships are borne by the plaintiffs as a result of IOLTA —— their position, vis-à-vis Takings Clause law, is exactly the same with or without IOLTA, relegating their dubious complaints solely to the realm of the First Amendment.

It is indeed a novel extension of Fifth Amendment jurisprudence to allow these plaintiffs to prevail without any showing of loss or hardship. In fact, in this case, it is the

_____

[14]   364 U.S. 40, 49 (1960).

prescribing of injunctive relief that assaults the notions of fairness and justice underlying the Amendment. It is the plaintiffs —— accused by some of playing the dog in the manger[15] —— who, begrudging others what they cannot themselves enjoy, seek to dismantle a program that promotes the public good without placing undue burdens on any one person or group.

## C. **Incongruous Rationale Underlying the Per Se Doctrine**

Loretto explains the rationale for employing the per se analysis in physical invasion cases: "Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.' To the extent that the government permanently occupies physical property, it effectively destroys each of these rights."[16] This rationale, although convincing in the context of real and tangible personal property, is inapt when the property at issue is the speculative interest on the plaintiffs' pooled funds in an IOLTA account: unpooled, such principal could not generate net interest. Without Congress's enactment of 12 U.S.C. § 1832, which permitted the creation of NOW accounts, a client's principal would have absolutely no economic value to the client beyond the

---

[15] See Donald L. Beschle, The Supreme Court's IOLTA Decision: Of Dogs, Mangers, and the Ghost of Mrs. Frothingham, 30 Seton Hall L. Rev. 846, 867 (2000); see also, Aesop, Aesop's Fables 1 (Grosset & Dunlap, eds. 1947) (describing a dog that cannot derive beneficial use of straw, but inexplicably, perhaps for some perverse satisfaction, denies an ox that eats the straw access to it; the author includes the story's moral: "Ah, people often grudge others what they cannot enjoy themselves.").

[16] Loretto, 458 U.S. at 435 (emphasis in original) (citation omitted).

11

value of the principal itself.[17]  Therefore, unlike real or tangible personal property, the plaintiffs' property right to receive interest on their principal, with or without IOLTA, is a kind of property that its owners cannot actually "use" or "dispose" of, even if it is, hypertechnically, their property.

The Supreme Court, in deciding that the interest on IOLTA accounts is property, noted that valuable rights other than economic rights appertain to property.  Specifically, the Court's majority opinion states that "[w]hile the interest at issue here may have no economically realizable value to its owner, possession, control, and disposition are nonetheless valuable rights that inhere in property."[18]  Even though, as an abstract universal proposition, this is undoubtedly true, the Court did not inform us just what those other "valuable rights" would be in the context of the specific property at issue.  I find perplexing the Court's statement that property may still have value, other than its pure monetary value, given the context of the kind of property here at issue — money.  With the utmost respect (and at the risk of revealing my own intellectual shortcomings), I read the Court's opinion in <u>Phillips</u> as begging the question of what other "valuable rights" inhere with the ownership of money, which, axiomatically, can only be defined by its face value.

---

[17]  The interest that accrued on those accounts would be forfeited to the banks which held the accounts.  See <u>IOLTA II</u>, 270 F.3d 180, 182-83 (5th Cir. 2001).

[18]  <u>Phillips</u>, 524 U.S. at 170.

12

Second, none dispute that, even without IOLTA, the plaintiffs cannot physically "possess" this chimeric interest or even "control" where these funds end up. The plaintiffs' mythical "choice" is between allowing banks to gobble the interest, using each client's principal as an interest-free loan, on the one hand, or allowing the lawyers of Texas, under the supervision of the Texas Supreme Court, to fulfill the legal profession's ethical duty to the needy by diverting the interest to legal aid societies, on the other. Put simply, the "valuable rights" other than economic value that appertain to real or tangible personal property simply do not exist when the property at issue is potential interest on a principal amount that alone is too small or held too fleetingly to generate net interest for its owner.

When carefully assayed, the property at issue in IOLTA constitutes a unique variety that does not easily conform to the traditional rights attendant on real or tangible personal property. Understanding this, Justice Souter stated in dissent that "it is enough to note the possible significance of the facts that there is no physical occupation or seizure of tangible property, that there is no apparent economic impact...."[19] This observation demonstrates that, even though the Supreme Court decided that the interest on IOLTA accounts is property, the Court has not yet identified the type of taking, if a taking at all, that is effected by appropriation of IOLTA interest.

---

[19] Id. at 176 (Souter, J. dissenting).

13

The difficulty in evaluating the type of analysis that is appropriate for IOLTA funds is especially important in light of the Supreme Court's explanation that "physical appropriations are relatively rare, easily identified, and usually represent a greater affront to individual property rights."[20]  The Ninth Circuit's en banc analysis and my dissent in this circuit's IOLTA II case, not to mention the 5-4 divided Supreme Court, confirms that we are not presented with a situation that is susceptible of easy legal categorization, a fact that militates against the panel majority's per se analysis.  In this case, and possibly all others involving a monetizable interest, the per se doctrine —— adopted from the Supreme Court's rulings in real and tangible personal property cases —— is a blunderbuss approach to an issue that requires target-rifle accuracy.

## D.  Balancing Approach Employed in Takings Cases Involving Money

Unfortunately, the few cases that address the Takings Clause in the context of money are not wholly on point.  They do, however, confirm that when the property at issue is money, a distinct analysis —— separate from per se or ad hoc, or any other method used for real and tangible personal property —— is required.  Both Webb's Fabulous Pharmacies, Inc. v. Beckwith[21] and United States v.

---

[20]  Tahoe-Sierra, 535 U.S. at ___, 122 S.Ct. at 1479 (discussing the contrast between regulatory takings of real property and physical intrusions on real property).

[21]  449 U.S. 155 (1980) (holding that the court clerk's appropriation of the interest on funds held by the court in an interpleader action was an unconstitutional taking because the

14

Sperry Corp.[22] are "fee for services" cases which were decided by assessing the relationship between the amount of money withheld by the governmental entity and the service provided by the government for which the money was withheld (court fees in Webb's, claims tribunal in Sperry). Although the Court held that a takings occurred in Webb's when the government appropriated an interpleader accounts' interest, the facts of Webb are inapposite to the instant case despite their superficial similarity. Webb's would be analogous to the case before us only if IOLTA programs indiscriminately appropriated the interest from a client's principal, whether or not on its own that principal would have earned net interest the receipt of which the client had a legitimate expectation. The defining terms of the IOLTA program, however, preclude this result by barring the deposit of that category of client funds into IOLTA accounts.[23]

More importantly, the focus in Webb's and Sperry is on the reasonableness of the relationship between the appropriated amount and the reasons for the appropriation, suggesting that, in the

---

funds were held for the benefit of creditors and the amount withheld was not reasonably related to services rendered by the court).

[22] 493 U.S. 52 (1989) (holding that withholding of a small percentage of an award from Iran-United States Claims Tribunal was not an unconstitutional taking because the amount was not clearly excessive as a user fee).

[23] TEAJF Rule 6 (Client funds may be deposited in an IOLTA account only if those funds "could not reasonably be expected to earn interest for the client or if the interest which might be earned on such funds is not likely to be sufficient to offset the cost of establishing and maintaining the account....")

15

context of money, the Supreme Court <u>does not apply</u> the same per se analysis it uses in the context of real and tangible personal property. Without question, in both cases the governmental entity forthrightly took control of the funds, but in neither case was the taking by itself determinative of the outcome. Significantly, one of the dispositive factors in <u>Webb's</u> was that "Webb's creditors...had more than a unilateral expectation" in the accruing interest and that "it was property held only for the ultimate benefit of Webb's creditors."[24] In contrast, the plaintiffs here cannot possibly have any financial expectation (unilateral or otherwise) in the interest from the IOLTA account — their funds could never gain net interest for them, even without IOLTA.[25]

In all likelihood, these specific concerns, which arise when the property at issue is money, are what prompted the Court to remark in <u>Sperry</u> that "[i]t is artificial to view deductions of a percentage of a monetary award as physical appropriations of property. Unlike real or personal property, money is fungible."[26] In both <u>Webb's</u> and <u>Sperry</u> the Court engaged in an implicit weighting of factors, similar to that undertaken in a case expressly employing ad hoc analysis, to determine the

---

[24]  <u>Webb's</u>, 449 U.S. at 451.

[25]  <u>See</u> <u>supra</u> note 23.

[26]  493 U.S. at 62, n. 9. Contrary to Judge Kozinski's argument in his dissent from the Ninth Circuit's en banc opinion in <u>WLF v. LFW</u>, fungibility is relevant and important. It not only affects the choice of Supreme Court precedent to be applied, but, as discussed further below, obviates and renders inapt injunctive remedies.

reasonableness of the appropriations involved.

This theme as articulated in <u>Sperry</u> —— that money is a unique type of property which is inadequately covered by conventional real or personal property analysis —— is reflected in two subsequent appellate court cases.  In <u>Nixon v. United States</u>, the D.C. Circuit held that personal property is subject to <u>Loretto</u>'s per se doctrine.  In doing so, however, the court expressly described <u>Sperry</u> as clarifying that, although real and personal property are subject to the doctrine, money does not receive per se analysis.[27] More recently, in <u>Branch v. United States</u>, holding that the Fifth Amendment was not violated by the federal government's seizure of one bank's assets to offset losses of another bank owned by the same bank holding company, the Federal Circuit stated that "[b]ecause of 'the State's traditionally high degree of control of commercial dealing,' the principles of takings law that apply to real property do not apply in the same manner to statutes imposing monetary liability."[28]  Seeming to foreshadow the unique nature of IOLTA, the <u>Branch</u> court, using <u>Sperry</u> as its paradigmatic example, continued:  "Nor are other, less conventional assessments viewed as per se takings, requiring compensation without inquiry into their

---

[27]   978 F.2d 1269, 1285 (D.C. Cir. 1992) (the court's parenthetical explanation of <u>Sperry</u> following its citation of that case reads: "distinguishing between money, which is not subject to the per se doctrine because it is fungible, and 'real or personal property'").

[28]  69 F.3d 1571, 1576 (Fed. Cir. 1996) (quoting <u>Lucas v. South Carolina Coastal Council</u>, 505 U.S. 1003 (1992)).

17

reasonableness."[29]

The Texas IOLTA program is nothing if not a "less conventional" method of regulating financial dealings with commercial institutions so as to fulfill the legal profession's ethical obligation to the underprivileged members of society. Thus, the panel majority's application of the per se doctrine, in the form developed for real and personal property other than money, is a highly questionable proposition that suffers from two palpable analytical flaws: (1) It is not grounded in definitive or wholly applicable Supreme Court precedent; and (2) it fails to address the special treatment accorded by the Supreme Court and other appellate courts to situations in which the property purportedly taken is money.

E. **Inadequate Case Law Support for Application of Per Se Analysis**

A closer study of the four cases relied on here by the panel majority to reach its conclusion regarding the per se doctrine further illustrates the weakness of the panel's argument.[30] According to the panel majority, Phillips, and Webb's and Loretto (the two cases on which Phillips relied), "compel applying the per se analysis."[31] I must disagree: The analysis in Phillips mandates no such method; the Court specifically answered only the question

---

[29] Id.

[30] See Phillips, 524 U.S. 156; Lucas, 505 U.S. 1003; Webb's, 449 U.S. 155; Loretto, 458 U.S. 419.

[31] 270 F.3d at 186.

whether the interest on IOLTA accounts was property, expressly pretermitting any discussion of takings and just compensation. The Court's majority opinion cites Webb's only for the proposition that interest follows principal, and cites Loretto only for the proposition that an item can be property without having a positive economic or market value. Thus, the panel majority's reading unduly strains the plain language of Phillips. The simple fact of the Court's reliance on Webb's and Loretto for the "property" analysis does not dictate application of those cases to the takings question.

Furthermore, as discussed above, those case are factually and legally distinguishable from the instant case, making any rote application of their reasonings or holdings simplistic and incongruous. Webb's was a user-fee case that did not address either per se or ad hoc approaches, instead basing its holding on (1) the legitimate expectation of accrued interest by creditors, and (2) the arbitrary relationship between the amount taken and any service rendered by the government.[32] Loretto implicated an actual, physical occupation of real property by a cable company's lines. As the Court was dealing with a brick-and-mortar item, the presence of the cable lines actually did interfere with other "valuable

---

[32] As already stated, the Court's focus on these factors in Webb's implicitly endorses a non-categorical approach to takings analyses that involve money. The panel majority's focus on the "factual similarity" of Webb's is misleading because the cases would be factually analogous only if clients whose principals could, on their own, earn net interest were pooled in an IOLTA account despite those clients' legitimate expectations of possessing the interest on their principals.

19

rights" such as the right to control, dispose of, and otherwise profit from the physical space occupied by the cables. It is these prototypical physical invasion cases (and parallel tangible personal property cases) for which the Supreme Court created per se analysis in the first place, and it is only these to which the analysis has been applied. No case cited by the panel majority or written by the Supreme Court has rotely applied the per se doctrine to the putative taking of money or a monetizable interest.

With similar fallacy, the panel majority reads Loretto to stand for the proposition that physical occupation of property constitutes a per se taking "regardless of the economic impact on the owner."[33] The holding of Loretto, however, is much narrower: The physical invasion of real property, no matter how minimal, is a per se taking. Specifically, the Loretto court stated that a permanent physical occupation is a per se taking even if the action "has only minimal economic impact on the owner [of the real estate]."[34] Thus, Loretto did not answer the more difficult question of how to assess a purported taking with no economic impact on property that is only valued monetarily — money. The panel majority's invoking of Loretto still leaves three issues unsatisfactorily unresolved: (1) whether appropriation of potential net interest from pooled principals, which principals by themselves could not produce net interest, is a physical invasion or

---

[33] 270 F.3d at 187 (emphasis added).

[34] 458 U.S. at 435.

20

occupation; (2) whether the takings analysis for real or tangible personal property is applicable to the purported taking of potential interest; and (3) what is the proper treatment of monetary appropriations that have no economic impact on the property owner whatsoever.

Finally, <u>Lucas</u>, another case cited by the panel majority in an effort to support its application of per se takings analysis, provides only paper-thin support, if any support at all, for the panel majority's position. In <u>Lucas</u>, the Court dealt with a <u>regulatory</u> taking of real property. Even though it was a regulatory taking and not a physical invasion, the Court abandoned the ad hoc test of <u>Penn Central</u> and declared the regulation a taking because it had caused the property owner to "sacrifice <u>all</u> <u>economically beneficial</u>" uses of his property.[35] If the panel majority truly wants to apply <u>Lucas</u> to the instant case, then the relevant inquiry must be whether IOLTA strips the plaintiffs of all <u>economically</u> <u>beneficial</u> use of their property (i.e., their interest). Simply and accurately, the answer is no. Even absent IOLTA, the plaintiffs cannot use the interest on their principals because their funds will not gain net interest; therefore, by definition, vis-à-vis the plaintiffs, there is no such thing as an economically beneficial use that the government could have taken. The plaintiffs' counter argument —— that, even though no economic benefit is lost through the program, IOLTA robs them of the

_____

[35] 505 U.S. at 1019 (emphasis added).

21

subjective benefit of letting their speculative interest lie fallow — is not a takings claim; at most, it is a dubious First Amendment claim.

The panel majority's reliance on <u>Lucas</u> is rendered even more tenuous by the Supreme Court's statement in that case regarding the treatment of commercial dealings. Discussing the regulatory taking of real property, the Court in <u>Lucas</u> declared

> It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police power;... And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealing, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale). In the case of land, however, ...."[36]

This statement in <u>Lucas</u>, read in conjunction with the Federal Circuit's approach in <u>Branch</u>,[37] casts even greater doubt on the panel majority's decision to subject the potential interest here at issue to the doctrines used to evaluate takings of real property and personal property other than money. Far from "compelling" a per se approach, the panel majority's analysis belies the complexity of established Takings Clause precedent and avoids tackling the demanding questions presented by a taking of monetizable property as distinguished from real and tangible personal property.

---

[36]  <u>Id.</u> at 1027-28.

[37]  <u>See</u> <u>supra</u> notes 27-28 and accompanying text.

22

### III.  The Amount of Just Compensation Due, If Any

The second question left open by the Supreme Court's opinion in Phillips is what just compensation, if any, is due. Consistent with my dissent but contrary to the panel majority's view, the Ninth Circuit held that, even if there were a "taking" of property," it was not done without just compensation:  Just compensation for zero is zero. Relying on Justice Holmes statement in Boston Chamber of Commerce v. City of Boston that "the question is What has the owner lost? not What has the taker gained[,]" the Ninth Circuit sought to determine what the plaintiffs would have gained in the absence of IOLTA.[38] Concluding that the most that the plaintiffs lost was the esoteric right to prevent their principal from earning interest (presumably only because they opposed the government's making use of that interest without their consent —— or downright disapproval of the uses to which "their" interest would be put), that court found that the plaintiffs suffered neither economic loss nor the loss of a right with economic value.

The Supreme Court's opinion in Phillips neither decreed nor compelled an answer to the just compensation question; in fact, the Phillips majority specifically wrote that "whether client funds held in IOLTA accounts could generate net interest is a matter of some dispute."[39]  Traditionally, the resolution of these factual disputes is the province of the district court.  Here, following

---

[38]  271 F.3d at 862 (quoting Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195 (1910)).

[39]  524 U.S. at 169 (emphasis added).

remand, presentation of testimony, and hearings regarding various accounting and economic theories, the district court determined, as a factual matter, that individual client funds could not generate net interest and therefore the plaintiffs' loss totaled zero dollars. The plaintiffs essentially conceded this point, and none contends that this finding is clearly erroneous. The district court's factual finding in this regard should erase the doubts expressed by the <u>Phillips</u> majority, as no dispute should currently exist: When no just compensation is due, the taking is not unconstitutional.

Keeping the finding of zero compensable loss firmly in mind, our panel should have followed the chronological analysis prescribed for all takings cases: First determine whether a takings occurred, and then determine the amount of just compensation, if any, that is due. Importantly, the Fifth Amendment has never been read to proscribe a taking <u>vel</u> <u>non</u>;[40] rather it is a constitutional guarantee that anything taken will be justly compensated for, if necessary.[41] Thus, the logic that flows from this established understanding of the Fifth Amendment is that

---

[40] <u>First English Evangelical Lutheran Church of Glendale v. Los Angeles</u> (<u>First English</u>), 482 U.S. 304, 314 (1987) ("As its language indicates, and as the court has frequently noted, [the Fifth Amendment] <u>does not prohibit the taking of private property</u>, but instead places a condition on the exercise of that power.") (emphasis added).

[41] <u>Id.</u> ("This basic understanding of the Amendment makes clear that it is designed not to limit the governmental interference with property rights <u>per se</u>, but rather to secure <u>compensation</u> in the event of otherwise proper interference amounting to a taking.") (emphasis in original).

a takings by itself, even one that is a per se taking, is not unconstitutional; only failing to compensate the dollar value of any resulting loss is unconstitutional. Incredulously, by invoking the ripeness doctrine, the panel majority turned this straightforward and controlling approach on its head, opting instead for a circular analysis that finds no support in logic or case law.

Assuming, arguendo, that a takings occurred (whether per se or otherwise), the proper analysis of IOLTA should have proceeded thusly: (1) The potential interest on an IOLTA account is property; (2) a taking occurred (my arguendo assumption); but (3) the plaintiffs demonstrated a monetary loss of zero as determined by the district court's extensive fact-finding; so (4) the amount of just compensation due to the plaintiffs is zero; (5) the taking (whether per se or otherwise) is not unconstitutional; ergo, no remedy is required. Instead of dealing with the just compensation determination in this direct manner, as it should have, the panel majority instead jumped from a finding of a per se taking to a prohibition of the taking through injunctive relief —— the exact result proscribed by the Supreme Court in First English.[42]

When reduced to its essentials, the panel's novel methodology appears to proceed in this order: (1) the potential interest on the IOLTA accounts is property; (2) a per se takings occurred under Loretto; (3) having determined that a per se taking of property

_____

[42] Id.

25

occurred, the district court's finding of zero loss is irrelevant; (4) because a takings has occurred there must be some available remedy (even though none is mentioned in the Constitution) regardless of the district court's finding; so (5) in the absence of provable loss, the appropriate remedy is injunctive relief, a prophylactic which prohibits the taking rather than simply placing a condition on it. This logic is a perversion of all established Fifth Amendment jurisprudence and finds absolutely no support in case law.

Under the instant facts, the rule should be that when the allegations specify that a monetary interest was taken, what follows from the finding of zero loss is not that declaratory and injunctive must be awarded, but rather that the taking is not unconstitutional. The panel majority has conflated (1) its determination that the appropriation of IOLTA interest is a per se taking with (2) the determination that it is also per se unconstitutional. This conflation puts the proverbial cart before the horse: Finding no provable economic loss (for the alleged taking of money), but somehow convinced of the impropriety of the transaction and thus the need to find a remedy, the panel majority retroactively searches for the only other possible remedy available — injunction.

But again, this novel creation produces a flawed methodology. The plaintiffs in this case do not receive monetary compensation because they have lost nothing of economic value, putting the lie to their claim that the government has unconstitutionally taken

26

their property (specifically, their speculative interest from their contribution to the pooled principal in the IOLTA account).[43] The very fact of their inability to prove a compensable monetary loss should end the case, not trigger a search for alternative equitable remedies. The absence of value means, quite straightforwardly, that the appropriation of the plaintiffs' property in this case is not proscribed by the Fifth Amendment.

Finally, even if the panel majority's per se analysis were to be accepted, injunctive relief, although the only potential remediation available to a plaintiff with no provable loss, is wholly inappropriate. Rather than fabricating jurisprudence that seeks to match some remedy with a perceived constitutional violation, the direct (and correct) approach is to provide the expressly prescribed constitutional remedy. In this case, because money is the only property alleged to have been taken — and because money is fungible — the only remedy is the payment of just compensation in money. This leads to the absurdity of taking a dollar and, in return, compensating the former owner with a dollar. Unlike other personal property, which may have no market value but possibly has enough subjective personal value, e.g., sentimental or historical, to justify an injunction, money is defined only by its facial economic value. Most importantly, an injunction in this case contravenes the fundamental dictates of Fifth Amendment

---

[43] See United States v. Causby, 328 U.S. 256, 261 (1946) ("It is the owner's loss, not the taker's gain, which is the measure of the value of the property taken.").

27

jurisprudence by prohibiting the taking of property even though the government stands willing to pay just compensation.

Furthermore, given the nature of the property at issue, agreement with the Ninth Circuit's en banc position or my dissent does not equate to subscribing to a blanket rule that the taking of property of no fair-market value results in a rule that no unconstitutional taking has occurred each and every time. I recognize, for example, that if, as part of its permanent retrospective on its founders, a town wants to take Aunt Bertha's amateurish self-portrait (with zero net fair market value), or if, for its historical display, a city wishes to take the remains of a chimney (with zero net market value) from a burned-down house on my old home place, such governmental actions may well constitute "takings" of "property" that might properly be addressed with injunctive relief. But when the taken property is dollars (or, more accurately, the abstract right to potential dollars of net interest earned when one client's principal is pooled with the principal of other clients of the law firm), declaratory or injunctive relief is, at best, a highly questionable proposition. Loss of a "monetizable" interest is a stereotypical example of a situation in which there need be no relief, injunctive or otherwise. When –– more accurately, if –– the plaintiff/client can prove an actual dollar loss, he can be compensated fully for that loss and be made whole, without resorting to declaratory or injunctive relief; if he cannot prove deprivation of actual monetary value, his redress against the taker must be at the ballot

box, not in court.

As I noted in my panel dissent, "our" district court found that under any applicable accounting method or economic analysis — either in-firm pooling, sub-accounting, or net-benefit theory — the plaintiff/client (Summers) suffered no loss. Put simply, Summers is in exactly the same financial position with the IOLTA program in place as he would be in its absence. As he complains of an outright financial taking (and not the taking of either real or tangible, personal property), our most straightforward approach would be — and should be — to determine the exact dollar amount purportedly confiscated from Summers.

As a factual matter, the district court found (as did the Ninth Circuit regarding similarly situated plaintiffs) that the plaintiff's compensable loss — past, present, and future — summed to <u>zero</u> dollars. Thus, although Summers complains of the confiscation of his property right to interest, he cannot under any accounting theory or economic analysis establish a dollar — or cents! — figure that is owed to him by the governmental taker. He presents a perfect illustration of Justice Holmes's point: Although the state (actually, various legal services organizations) gained money, Summers was deprived of none.

## IV. Conclusion

Vested with the constitutional authority to regulate the legal profession — the state's recognition of classic republican separation of powers — the Texas Supreme Court created the Texas IOLTA program to address, <u>inter</u> <u>alia</u>, lawyers' ethical

29

responsibility to provide legal services to the poor. Even if —— unlike real or tangible personal property —— the interest earned (or to be earned) on lawyers' trust accounts that is used to fund those services is, hypertechnically, the "property" of the owners of the principal, those owners must show monetary loss before they can state a Fifth Amendment claim to be compensated by the state. But, they cannot show such a loss, so they cannot state such a claim: Absent a showing of loss, any allegedly uncompensated "taking" by the state is constitutionally permitted. Unlike the tangible property illustrations, a taking of an intangible financial right with no market value —— and thus not subject to being taken unconstitutionally —— cannot lead alternatively to an enjoined, prior-restraint proscription of the taking.

As I disagree with the reasoning and result of the panel majority opinion, I respectfully dissent from denial to rehear this case en banc and, as a result of that denial, from failing to reinstate the ruling of the district court.